Alexander Vitale, J.
The defendant moved to suppress certain evidence consisting of a record or potential testimony reciting or describing a statement made by Mm to a public servant, on the ground that the statement was coerced through *469 the use of a polygraph device. (CPL 710.20, subd. 3; CPL 60.45.) The motion was granted to the extent that a hearing was held to determine the admissibility of the statement upon the trial of the indictment. At the hearing the People offered the testimony of three witnesses: Detective Donald Daigneault, Fire Marshal James A. Holmes, and Detective Sergeant Edward Groutink, the polygraphist. The defendant offered no evidence. The facts are largely uncontested. (Note: The parenthetical remarks relating to the polygraph test are merely explanatory and not reflective of any testimony at the hearing unless otherwise indicated.)
PRELIMINARY PACTS
On Friday, the 11th of August, 1972, a fire broke out in a laundry room of the Nassau County Medical Center at approximately 7:30 p.m. The following day brought two more fires. Detective Daigneault and Fire Marshall Holmes were assigned to investigate the origins of these fires.
The Monday next, August 14, 1972, Daigneault and Holmes interviewed employees of the Medical Center who worked on the second floor in the vicinity of the fires. The interviews took place at the Medical Center. Among the five or six persons interviewed was the defendant, Patrick Wilson. As a recent employee who had been on duty at the time of all three fires, Wilson was concerned about his job. Wilson said that he had seen smoke coming from a laundry chute on the second floor on the Friday in question, and he had traced it to a laundry room. After entering the laundry room and unsuccessfully attempting to extinguish the flames, he had pulled the fire alarm.
In the course of this conversation between the investigators and the defendant the possibility of a polygraph examination was mentioned. Wilson expressed a desire to take such a test and showed no outward nervousness about the possibility. Daigneault arranged for a polygraph test to be administered the next day, although Wilson was not then a suspect but merely one of several employees with whom the possibility of taking such a test was discussed.
Unescorted by the police, Wilson arrived at Police Headquarters on Tuesday, August 15,1972, for the purpose of taking the polygraph test. He met Daigneault and Holmes there and together they proceeded to the polygraph room, engaging only in general conversation. Wilson, who did not appear particularly nervous, was left sitting outside while Daigneault and Holmes entered the polygraph room to brief Detective Sergeant *470 Groutink on the details surrounding the fires and on Wilson’s background.
While Holmes continued the briefing, Daigneault went out to Wilson and gave him the Miranda warnings by reading them from a card which states: “ I have been informed by the detective that I have the right to remain silent and any statement I do make may be used as evidence against me in court. Also, I have the right to talk to a lawyer before any questions and to have an attorney present at any time. Further, that if I cannot afford to hire a lawyer, one will be furnished me, and I have the right to remain silent until I have had the opportunity of consulting with an attorney. Having been informed of these rights I wish to make the following statement without consulting an attorney at this time.”
Wilson professed to understand the cautions and persisted in his willingness to proceed with the test. Daigneault asked him no questions but merely conducted him to the polygraph room and introduced Groutink. Groutink informed the defendant that the test was voluntary and explained the consent form which states:
“I, , residing at do hereby consent and agree to submit to a polygraph (lie detector) examination. Further, I have been informed' by the polygraphist that I have the right to remain silent and that anything that I say may be used as evidence against me in court. Also, that I have the right to talk to a lawyer before answering any questions or to have an attorney present at any time. Further, that if I cannot afford to hire a lawyer, one will be furnished me and I have the right to remain silent until I have had the opportunity of consulting with an attorney. Having been informed of these rights and understanding these rights I now wish to take the polygraph examination without consulting an attorney at this time.”
Thus, Groutink’s explanation of the consent form constituted a second repetition of the Miranda warnings. At Groutink’s request, Wilson read over the consent form, signed it and expressed his willingness to proceed with the test. Daigneault and Holmes then left the room and the test may be considered as starting at this point. It was 11:10 a.m.
THE POLYGBAPH TEST
While explaining the consent form, Groutink told the defendant that if he were going to tell the truth, he had nothing to fear, but if he were going to lie, he should not take the test. As *471 the test was about to commence, Wilson indicated a desire to go to the bathroom and was permitted to do so in the company of Daigneault. Upon returning, he was left sitting alone in the polygraph room for about five minutes so as to become acclimated to his surroundings.
The room was approximately 11% feet square, with a pleasant green rug. The walls were two-tone green. Acoustic tiles were present in the ceiling in a random pattern. A shelf on one wall contained certain paraphernalia relating to the polygraph machine, such as ink. Venetian blinds hung on the one window and the polygraph sat on an ordinary grey desk. The machine was about 18 by 10 inches.
Goutink then returned to the room and began to take background information from the defendant both for the purposes of the test and to relax the subject. He explained the functioning of the machine. The explanation was roughly as follows:
“ The theory behind (the polygraph) is that it records emotional changes through physiological responses of the individual. These are the responses controlled by the autonomic nervous system, a branch of the nervous system over which the individual has no control. When an individual is lying he produces feelings of guilt or fears of detection which generally cause true anxiety, tension and fear. As a result changes occur in the physiological responses which the polygraph records.
“ The primary response measured is that of the heart as indicated by blood pressure and pulse rate. Respiratory responses are also measured, that is, breathing and finally, galvanic skin responses which are measured by electrodes attached to two fingers.”
Any questions the defendant might have had about terms used in the explanation would then have been answered.
Following the explanation Goutink went over with the defendant the questions which he would ask. during the test. As yet, the defendant was not connected to the machine. The purpose of the review is primarily to resolve any problems the subject might have concerning the questions which would prevent him from giving a simple yes or no response.
Goutink again cautioned the defendant that if he were going ■ to tell the truth, he should take the test, but if he were going to lie, he should not. The defendant again expressed his willingness to proceed. At that point the various parts of the polygraph were attached to the defendant’s body.
The first part of the machine procedure, as opposed to the over-all technique, was a card test. The defendant was asked *472 to select one of seven cards and remember it. The card was then returned to G-outink. The polygraphist taking one card at a time, asked whether that card was the one which the defendant had selected. For test purposes the defendant had been instructed that he was to answer ‘ ‘ no ” each time. In this way, the polygraphist was assured of a lie so that the graphic indications related to that answer would be available as a guide in evaluating later responses. The defendant did as instructed and G-outink correctly identified which response had been a lie.
Thus far we have encountered three steps in the. polygraph technique: (1) the caution that if the subject is not going to tell the truth, he should not take the test; (2) the explanation of the machine’s operative principles; and (3) the card test. While each of these serves more than one end, they are united by a common purpose: fostering the myth in infallibility.
“ This myth is essential to present methods of lie detection. In a typical examination the subject is invited into a private waiting room by a receptionist who says the examiner will be ready in a few minutes. Actually, at this stage the test has already begun, for the receptionist is cast in a serious role. She offers the subject especially prepared reading matter which describes the lie detector as a virtually unerring instrument'. The initial hypothesis, guilty or not-guilty, is based upon the receptionist’s report of reactions to this literature. If the subject seems to be hostile, annoyed, or unsympathetic, guilt is indicated. If the subject is able to show enthusiasm for the machine, he will have established himself, prima facie, as innocent * * *
“ A second purpose of the myth is to heighten the subject’s bodily reactions. The routine of test administration * * * calls for an early and emphatic communication that the machine doesn’t lie. In order to give physiological responses of measurable amplitude, the subject’s * lies ’ must seem to him of some importance # * * If a subject were tested by an instrument for which he had neither respect nor confidence the conscious lie would not necessarily be accompanied by a labile physiological response of the type needed to discriminate between the experimental and control questions.” (Skolnick, Scientific Theory and Scientific Evidence: An Analysis of Lie-detection, 70 Yale L. J. 694, 704-705 [1961].)
Viewed in this light, components of the polygraph technique which otherwise appear innocent or even commendable take on different coloration. The repeated cautioning, for example, which on the surface appears to be nothing but good advice, has *473 the subtle effect of bolstering the subject’s faith in the infallibility of the machine.
The card test completed, Goutink proceeded to pose the questions formulated for this particular subject. The questions were of three types: irrelevant questions (“Do you live in the United States? ”), control questions (“ Did you ever commit any unusual sexual acts? ”), and relevant questions. The relevant questions were:
1. “Do you intend to answer each question with the truth? ”
2. “Do you know for sure who started the fires? ”
3. “' Did you start any of these fires? ”
4. “ Did you witness any of those fires being started last Saturday? ”
5. “ Are you the one that started either [sic] one of these three fires in Meadowbrook? ”
(The irrelevant questions are just that, irrelevant. The control questions, however, serve a purpose. If the subject is innocent of the crimes in question, he will display the greatest stress or anxiety on the control questions rather than the relevant questions.)
After asking the questions Goutink permitted the defendant to rest for approximately five minutes and then asked them a second time. Satisfied with the results, Goutink retired to examine the graphs, but, before leaving the polygraph room, he asked the defendant what he thought the graphs would show.' Wilson said that he did not know. This is part of the technique, for the subject’s response is indicative of guilt or innocence and aids the polygraphist in his interpretation. (Skolnick, supra, pp. 705-706.)
Goutink studied the graphs for about 10 minutes and arrived at the conclusion that the defendant’s responses to the relevant questions had been deceptive. He returned to the polygraph room and told the defendant that it was his opinion that the defendant had lied. Wilson could offer no explanation. Goutink then discussed the matter with the defendant for approximately 35 minutes, reiterating three or more times that in his opinion Wilson had lied. Wilson, who appeared to be composed, stated that, while working at the Nassau County Medical Center he had taken two cigarettes and thrown them down a laundry chute to see where the chute led. He then went down to the basement and saw that there was a fire. Goutink asked if the defendant would repeat his statement for Daigneault and1 Holmes since it was their investigation, and the answer was affirmative. .
*474 THE SECOND CONFESSION
Groutink left the polygraph room to converse with the two investigators. He informed them that he was of the opinion that Wilson had lied during the polygraph test; that Wilson had made a statement implicating himself in the fires; and that Wilson wished to talk to them. Daigneault and Holmes entered the polygraph room where Wilson repeated to them his statement. Wilson appeared normal at this time. It was 2:30 p.m.
At no point in this course of events had Wilson been arrested. No threats were made and there was no physical abuse. Wilson was at all times free to leave. Food and drink were available on request.
THE LAW
The issue presented is whether, in the circumstances of this case, the polygraph examination was so coercive as to render inadmissible a resulting confession. The polygraphist’s conclusions derived from the raw graphic data are relevant only insofar as they were communicated to the defendant and affected' his state of mind. Consequently, the inadmissibility in evidence of polygraphic test results premised on the insufficiency of their probative value need not be considered. (See People v. Leone, 25 N Y 2d 511; People v. Forte, 279 N. Y. 204.) It would not be inappropriate to comment, however, that we are on the threshold of completing the circle from prerational to postrational modes of proof.
“ Lie detection through physical change is actually a throwback to early forms of trial by ordeal. There are reports of a deception test used by Indians based' on the observation that fear may inhibit the secretion of saliva. To test credibility, an accused was given rice to chew. If he could spit it out he was considered innocent, but if it .stuck to his gums he was judged guilty.” (Skolnick, supra, p. 696; cf. with Inbau and Reid, Criminal Interrogation and Confessions [1967], p. 35.)
Although New York precedent is sparse (People v. Zimmer, 68 Misc 2d 1067, affd. 40 A D 2d 955), other jurisdictions unanimously agree that the use of a polygraph will not, in and of itself, render a confession inadmissible as the product of coercion. (State v. Keiper, 493 P. 2d 750 [8 Ore. App. 354]; United States v. McDevitt, 328 F. 2d 282 [6th Cir., 1964]; State v. Traub, 150 Conn. 169; State v. Varos, 69 N. M. 19; Collins v. State, 171 Tex. Cr. R. 585; Tyler v. United States, 193 F. 2d 24 [D. C. Cir., 1951]; Smith, Law of Confessions and Scientific Evidence [1963], p. 205.) Rather, the polygraphic examination is but one factor *475 to be considered in determining whether or not there was impermissible coercion. (State v. Keiper, supra; Johnson v. State, 166 So. 2d 798, 802 [Fla. App.]; State v. Traub, supra, pp. 179-180, 235; Smith, supra, p. 205.) The one New York case in which the coercive effect of a polygraph was considered is in general agreement with these foreign authorities. (People v. Zimmer, supra.) There the subject’s state of mental derangement, the implication that polygraphic results could be used in evidence, the technique of examination and its length were all considered as factors amounting to coercion.
The inadmissibility of coerced confessions rests on three principles; one evidentiary and two constitutional. The evidentiary principle views an extrajudicial confession as a species of hearsay the admissibility of which is not obnoxious to the general policy of exclusion because confessions, like other admissions, are deemed to be worthy of belief. (3 Wigmore, Evidence [3d ed.], § 816.) Coercion, however, destroys the basis of trustworthiness since it is,. “ The tendency of the innocent, as well as the guilty, to risk remote results of a false confession rather than suffer immediate pain ”. (Stein v. New York, 346 U. S. 156,182.) Thus, insofar as the admissibility of a confession is governed by the evidentiary principle, the central issue is the probability of truthfulness. (CPL 60.45, subd. 2, par. [b], cl. [i].)
In contrast, the trustworthiness of the confession is a matter of indifference to the two constitutional principles. (Lego v. Twomey, 404 U. S. 477, 485.) One, the due process guarantees of the Fifth and Fourteenth Amendments focuses on procedural fairness primarily in the realm of police conduct while the other, the self incrimination privilege, concentrates on the more subjective concepts of free will and free choice.
The objective or due process principle has been expressed in the following terms: “ The abhorrence of society to the use of involuntary confessions does not turn alone on their untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.” (Spano v. New York, 360 U. S. 315, 320-321.)
The rule of exclusion which this principle supports applies not only to confessions induced by physical coercion, but also to those produced by more subtle means. “ Since Chambers v. Florida, 309 U. S. 227, this Court has recognized that coercion *476 can be mental as well as physical, and that the blood' of the accused is not the only hallmark of an unconstitutional inquisition. * * * The efficiency of the rack and the thumbscrew can be matched, given the proper subject, by more sophisticated modes of ‘ persuasion ’.” (Blackburn v. Alabama, 361 U. S. 199, 206.)
Because the underlying rationale is different, the issue to be resolved in determining whether exclusion is required by the due process guarantees differs from that posed by the evidentiary principle. The question is, “ [was] the behavior of the State’s law enforcement officials * * * such as to overbear [the defendant’s] will to resist and bring about confessions not freely self-determined [?] ” (Rogers v. Richmond, 365 U. S. 534, 544.) The test is objective in that its primary thrust is toward the law enforcement officials ’ externally manifested conduct and not toward the defendant’s subjective psychological motivation, except, of course, insofar as the defendant’s subjective. weaknesses were known to and played upon by the governmental agents.
The second constitutional principle is the self incrimination privilege contained in the Fifth Amendment; “No person * * * shall be compelled in any criminal case to be a witness against himself ”. The history of the privilege is illuminating as to its force. It derives from the competition between the inquisitorial and accusatorial systems of justice for predominance in England. The inquisition had been introduced into England as a method of extirpating heresy. Suspected heretics were asked to take: “ The oath de ver it ate didenda, to tell the truth to all interrogatories that might be administered, a seemingly innocuous obligation which in reality was an inescapable trap, a form of spiritual torture, tortura spiritualis, calculated to induce self-incrimination. Confession of guilt was central to the whole inquisitional process, and the oath, which was administered at the very outset of the proceedings, was reckoned as .indispensable to the confession. The accused, knowing neither the charges against him, nor his accusers, nor the evidence, was immediately placed between hammer and anvil: he must take the oath or be condemned as guilty, yet if he took the oath he exposed himself to the nearly certain risk of punishment for perjury — and his lies were evidence of his guilt — or condemned himself by admissions which his judge regarded as damaging, perhaps as a confession to the unnamed crime.” "(Levy, Origins of the Fifth Amendment [1967]), p.p. 23-24.)
*477 Faced with this Hobson’s choice, suspected heretics fought for the right to stand mute at the bar of justice, a right which was eventually won. (Miranda v. Arizona, 384 U. S. 436, 459-460.)
Viewed in the perspective of these origins, the self incrimination privilege might appear to be merely a testimonial privilege which imposes a negative obligation on the State, the duty not to compel the accused to speak. However: “As a ‘ noble principle often transcends its origins, ’ the privilege [against self incrimination] has come rightfully to be recognized in part as an individual’s substantive right, a ‘ right to a private enclave where he may lead a private life. That right is the hallmark of our democracy. ’ United States v. Grunewald, 233 F. 2d 556, 579, 581-582 (Frank, J. dissenting), rev’d. 353 U. S. 391 (1957).” (Miranda v. Arizona, supra, p. 460.)
In its modern development the self incrimination privilege has come to impose affirmative as well as negative duties on.the State, including the duty to apprise a defendant of his constitutional rights so that his decision to speak will be j;he product of free will and rational choice. (Miranda v. Arizona, supra, p. 465; Malloy v. Hogan, 378 U. S. 1, 8.)
The interpretation of the self incrimination privilege as requiring that the decision to speak be the product of the unfettered choice, of a free will (Miranda v. Arizona, supra, p. 465; Malloy v. Hogan, supra, p. 8) has the appearance of a subjective test. This, however, cannot be the case, since “ all law is directed to conditions of things manifest to the senses [and a] man must find out at his peril things which a reasonable and prudent man would have inferred from things actually known.” (Holmes, The Common Law [1881], pp. 42, 61-62.) The existence of free will may be a topic of debate for philosophers, theologians and psychologists, but the law presumes its existence, absent evidence to the contrary, as a prerequisite to any system of justice. Nor is any choice unfettered in the absolute sense, for the available options are always finite in number: What the self incrimination privilege requires is that the accused’s choice be a rational one between available options without any impermissible penalties being attached to the choice of silence. (CPL 60.45, subd. 2, par. [a].)
With respect to a confession, the choices available to a suspect are three: silence, truth or deception. Silence carries with it a penalty of increased suspicion, for the social convention is that one speaks when spoken to. The law does not require that tire police ignore what has been the common experience of mankind, *478 namely, that silence is often used to conceal. However, attaching any greater penalty to the invocation of the privilege violates the constitutional han on compulsion. The truth option carries with it a penalty only if it is either incriminating or embarrassing. Lying, too, has its penalties — to wit, disbelief, increased suspicion and probing questions. A suspect has no right to choose the lie and have it go unchallenged.
Miranda established a prophylactic rule designed to insure a rational choice among the available options. It requires that a suspect be informed of his right to remain silent and his right to the assistance of counsel. These cautions were deemed necessary in light of sophisticated techniques of interrogation drawn from psychological and sociological observations of human behavior and extremely effective in eliciting the truth from those who will speak to the police. (Miranda v. Arizona, supra, pp. 448-455; see Inbau and Reid, Criminal Interrogation and Confessions [2d ed., 1967].) However, despite these techniques, one may nonetheless make a knowing and intelligent waiver of his rights and choose to talk with the police. (Miranda v. Arizona, supra, p 475.) Whatever the motivation, whether a psychological need to confess or a foolish faith in one’s talent for deception, if a suspect chooses to talk, our sense of fairness is no longer offended by stratagems designed to foster truth telling. (Cf. People v. Yukl, 25 N Y 2d 585, rearg. den. 26 N Y 2d 845; People v. McNeil, 24 N Y 2d 550, cert. den. sub nom. Spain v. New York, 396 U. S. 937.) Even deception is authorized. (People v. Pereira, 26 N Y 2d 265; People v. Boone, 22 N Y 2d 476.) Once having been informed of his rights and having waived them, a suspect who chooses to speak cannot complain when, caught in his own tangled web, he confesses. (See People v. Horton, 30 A D 2d 709, 710, cert. den. 394 U. S. 991. “ It is only when the submission to such investigative aids as drugs or the polygraph is involuntary that the fruit of the poisonous tree doctrine is applied. * * * While the confessions may have been triggered by the tests, the tests, if consented to, were not * poisonous ’ in the first instance and never became so.”) Even the poor, wretched and criminal may have to pay the price for their hubris.
CONCLUSIONS
Applying the principles just discussed to the facts of this case, the following conclusions are clearly indicated. Since the polygraph techniques here employed were truth-fostering, the admissibility of the defendant’s statements is in keeping with the evidentiary principle. The statements are worthy of trust.
*479 Both. Detective Daigneault and Fire Marshal Holmes testified that they used the polygraph primarily as an investigative tool for the elimination of suspects. As such it promotes economy and efficiency. There is nothing in the behavior of the police in this case which smacks of tyranny or which .was calculated to overbear Wilson’s will to resist. The statements were voluntary in the due process sense.
The uncontradicted1 testimony clearly establishes that Wilson was neither the prime suspect nor in custody prior to or during the polygraph examination or the subsequent statements. We attach no significance to the fact that Wilson, a stranger and civilian in a strange place, was accompanied to the lavatory by Detective Daigneault prior to the polygraph examination. Though neither the prime suspect nor in custody, Wilson was informed of his constitutional rights twice immediately before the test. He was also twice cautioned not to take the test if he intended to lie. Wilson knowingly and intelligently waived his rights to silence and to counsel and chose to speak. He could have stopped the test at any point by invoking his right to silence but he chose to continue. (Cf. People v. DeNicola, N.Y.L.J., Feb. 15, 1974, p. 20, col. 5.) When confronted with the polygraph results indicative of deception, Wilson made a rational choice among the then available options and confessed.
The motion to suppress is in all respects denied.