637 P.2d 354 (1981)
The PEOPLE of the State of Colorado, Plaintiff-Appellant,
v.
Richard ANDERSON, Defendant-Appellee.
No. 80SA79.
Supreme Court of Colorado, En Banc.
November 30, 1981.
*355 Alexander M. Hunter, Dist. Atty., C. Phillip Miller, Chief Deputy Dist. Atty., Boulder, for plaintiff-appellant.
Hemminger & Whittaker, Gary H. Hemminger, Englewood, for defendant-appellee.
ERICKSON, Justice.
Pursuant to section 16-12-102, C.R.S. 1973 (now in 1978 Repl. Vol. 8), the prosecution has appealed from a ruling of the trial court which permitted the admission at trial of evidence of a polygraph test and testimony by the polygraph examiner. We disapprove the ruling of the trial court and conclude that real and testimonial evidence of a criminal defendant's polygraph examination is per se inadmissible at trial.

*356 I.

THE FACTUAL BACKGROUND
The defendant, Richard Anderson, was charged by information with aggravated robbery[1] and first-degree sexual assault.[2] At the request of the prosecution, Anderson voluntarily submitted to a polygraph examination conducted by the Boulder County Sheriff's Department. The results of the test were inconclusive. Thereafter, the defendant hired his own polygraph examiner, who concluded that Anderson was truthful when he denied committing the crimes charged. The district attorney then suggested that Anderson be tested by another independent polygrapher, and chose Stanley M. Slowik to conduct the examination.[3] Slowik found Anderson "qualifiedly truthful" in his denial of the charges. The test results were made available to both the prosecution and defense counsel. Counsel for the prosecution and the defense, however, did not stipulate to the admission at trial of any results of or testimony regarding the polygraph examination.
On April 27, 1979, the defendant filed a "Motion to Allow Testimony of Polygraph Examiners and Written Report of Polygraph Examiners." After hearing testimony from two polygraph examiners, the court denied the motion. However, the court granted a rehearing on the defendant's motion, so that additional testimony and argument could be presented. The court then ruled, over the prosecution's objection, that the polygraph result and expert testimony would be admitted at trial.
At trial, Slowik testified as to the results of his polygraph examination of Anderson. A mistrial was declared on November 9, 1979, after a jury was unable to reach a unanimous verdict. At the conclusion of a second trial on January 23, 1980, where Slowik's testimony and the polygraph test result were again admitted, Anderson was found not guilty of both charges. On appeal, the prosecution asserts that the trial court erred in admitting the polygraph test result and testimony of the polygraph examiner. We agree and, for the reasons set forth in this opinion, we disapprove the ruling of the trial court.

II.

THE POLYGRAPH TECHNIQUE AND PROCEDURE
A brief review of the scientific principles and techniques underlying a polygraph examination is a necessary foundation for our conclusion. Polygraph examiners contend that conscious efforts to deceive by a rational individual cause the sympathetic branch of the autonomic nervous system to respond and produce a number of involuntary physiological responses.[4]United States v. Ridling, 350 F.Supp. 90 (E.D.Mich. 1972). It is not the act of lying per se which causes physiological changes, but the physiological stress created by lying which causes the autonomic nervous system to respond involuntarily. The physiological changes are identical to those which result from the exposure of an individual to a novel situation, or from emotional strain due to fear, anger, elation, excitement, anguish, or other emotion. Orne, Implications of Laboratory Research for the Detection of Deception, in Legal Admissibility of the Polygraph 95 (N. Ansley ed. 1975). Therefore, by attaching mechanical devices to a subject's body, a polygraph does not "detect" lies, but only monitors and measures certain physiological functions of the subject.
When a subject is tested with a modern polygraph machine, changes in blood pressure, pulse, respiration, and galvanic skin responses are measured and graphically recorded *357 as reactions to specific questions posed by the examiner. The subject's pulse rate and blood pressure are monitored by a sphygmonanometera standard blood pressure cuffwhich is attached to the subject's upper arm. Respiratory activity is measured by fastening pneumograph tubes around the subject's chest and abdomen. During the test, as the circumference of the subject's torso increases with each inspiration of air, the pneumograph tubes stretch; as the subject exhales, they contract. The pressure changes inside the pneumograph tubes are recorded on the graph, or polygram. Psychogalvanic or electrodermal skin responses are usually monitored by attaching electrodes to the subject's fingers. The electrodes emit a small, undetectable, stable electrical current, and measure the relative changes in skin resistance to that current. See J. Reid & F. Inbau, Truth and Deception: The Polygraph ("Lie-Detector") Technique 5-6 (2d ed. 1977).
Polygraphers claim that the psychological stress of lying causes the polygram to reflect noticeable changes in the subject's physiological responses. In most polygraph examinations, the examiner asks the subject a series of "neutral" questionsthose to which the examiner is certain of the answer and which are irrelevant to the issues to be determined, and "control" questionsother irrelevant questions to which it is expected that a deceptive response will be given. The subject's physiological reactions when responding to the control questions are then compared to those shown when asked the "relevant" questions, or direct questions on the target issue for which the examination is being conducted.[5] Polygraph experts claim that it is possible to examine the polygram and interpret the physiological responses to arrive at a conclusion regarding the subject's truthfulness or deception in answering the relevant questions:
"By strategically placing the control and relevant questions side-by-side in the examination, and comparing the subject's responses to the controls with those to the relevant questions on the charts, the examiner may make an accurate determination as to whether the subject was practicing deception. If the responses to the controls are greater than those to the relevant questions, the inference is that the subject is truthful on the major issue. In other words, if the subject responds more in answering the [control questions], it demonstrates not only deception as to that question, but also that his lesser reaction to the relevant issue question is an indication of truthful response to the latter." 14 Am.Jur. POF 2d 12 (1977).
See also Reid & Inbau, supra, at 59 et seq. In the usual polygraph examination, further interrogation and testing is conducted by the examiner to arrive at a diagnosis of truthfulness or deception by the subject. Id. at 42-50.
Since the crux of the polygraph technique is the development of the neutral, control, and relevant questions, all polygraph tests are preceded by a pretest interview. During the pretest interview, the examiner develops the exact questions used in the test, evaluates the subject for an indication of his truthful or deceptive nature, and obtains background information of the subject. Ideally, the examiner establishes a level of concern which will yield the optimal physiological record. The pretest must also convince the suspect of the effectiveness of the polygraph. Orne, supra, at 97. See also Reid & Inbau, supra, at 13.

III.

ADMISSIBILITY OF POLYGRAPH EVIDENCE
The defendant claims that the polygraph has attained a degree of reliability *358 and general acceptance in the scientific community which warrants the admission at trial of polygraph test results and testimony of polygraph examiners. So long as a proper foundation for expert testimony is laid, the defendant contends that the trial court may use its discretion to admit such evidence. We disagree. We do not believe that the physiological and psychological bases for the polygraph examination have been sufficiently established to assure the validity and reliability of test results. Nor are we persuaded that sufficient standards for qualification of polygraph examiners exist to insure competent examination procedures and accurate interpretation of the polygram. Further, use of the polygraph at trial interferes with and may easily prejudice a jury's evaluation of the demeanor and credibility of witnesses and their testimony. Accordingly, we conclude that any evidence of polygraph results and testimony of polygraph examiners is per se inadmissible in a criminal trial.

A.
The recurring questions of validity and reliability of the polygraph as an instrument capable of detecting deception create a number of issues.[6] One of the earliest decisions in this area was Frye v. United States, 293 F. 1013 (D.C.Cir.1923), which held that a systolic blood pressure deception test was inadmissible in federal criminal trials because it had not gained sufficient scientific standing to justify its use. The court in Frye established the traditional standard for admission of polygraph evidence at trial:
"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.
"We think the systolic blood pressure deception test has not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made." Id. at 1014.
Until recent years, application of the Frye standard by federal and state courts resulted in an almost universal determination that polygraph tests had not gained sufficient acceptance in the scientific communities of polygraphy, psychology, and physiology to justify their use at trial.[7]See Note, The Emergence of the Polygraph at Trial, 73 Colum.L.Rev. 1120 (1973); C. McCormick, Evidence § 207 (2d ed. 1972); Reid & Inbau, supra, at 309; Annot., 23 A.L.R.2d 1306 (1952) (later case Supp.). However, the polygraph instrument has since developed from the crude device used in Frye to a relatively sophisticated instrument which measures blood pressure, pulse, respiration activity, and psychogalvanic skin responses. See generally United States v. Ridling, 350 F.Supp. 90 (E.D.Mich. 1972). Moreover, the polygraph machine is increasingly being used in contexts other than a criminal trial, such as in law enforcement investigations and in preemployment *359 interviews.[8] Despite the increased degree of acceptance which the modern polygraph instrument has recently received, however, we are not persuaded that the scientific theory or technique of the polygraph is sufficiently advanced to permit its use at trial as competent evidence of credibility.
Individual physiological reactions to polygraph testing are not so universal as to permit reliable and standardized scientific measurements, despite claims by polygraph proponents that the device reaches a correct result more than 95% of the time.[9] Several uncontrollable or unascertainable physiological and psychological responses may cause difficulty or error in interpreting polygraph test results.[10]See United States v. Alexander, 526 F.2d 161 (8th Cir. 1975); Orne, supra, at 111; Reid & Inbau, supra, at 215. Polygraph experts readily admit that a suspect's state of mind and physical condition are variables that can alter the responses measured by a polygraph. See Note, The Emergence of the Polygraph at Trial, supra, at 1123; Reid & Inbau, supra, at 215 et seq.
Emotional tension, or "nervousness," experienced by a subject who is innocent and telling the truth regarding an offense, but who is nevertheless affected by fear of the suspicions and accusations directed against him, or by guilt of another, unrelated offense, may render the test results inaccurate. See Note, The Emergence of the Polygraph at Trial, supra, at note 14; Henderson v. State, 94 Okl.Cr. 45, 230 P.2d 495 (1951), cert. denied 342 U.S. 898, 72 S.Ct. 234, 96 L.Ed. 673 (1951); Reid & Inbau, supra, at 216. See also People v. Leone, 25 N.Y.2d 511, 255 N.E.2d 696, 307 N.Y.S.2d 430 (1969); State v. Valdez, 91 Ariz. 274, 371 P.2d 894 (1962). The very nature of the testing atmosphere can heighten a subject's fear of physical harm from the instrument or concern about the scope of the examiner's questioning. Further, unresponsiveness in a lying or guilty subject, because of lack of fear of detection, advance rationalization of the crime, or excessive prior interrogation, may also adversely affect the physiological responses on the polygraph machine. Because of such unresponsiveness, pathological liars routinely pass polygraph examinations. Henderson v. State, supra; Reid & Inbau, supra, at 224.
Various studies have identified several other factors or subtle abnormalities which may also impair the diagnostic reliability of polygraph test results. See Orne, supra, at 111. One court has listed such factors to include:
"[E]motional upset of the subject, his fatigue, drunkenness, subjection to drugs, bad physical or emotional condition, high blood pressure, hardening of the arteries, obesity, feeblemindedness, amnesia, psychotic condition, being a pathological liar, having lack of fear or lack of concern of being caught in a lie, surreptitious nervous stimulation, use of antiperspirant, hypnosis, or the presence of extraneous noise or abnormal temperature at the test locale." People v. Adams, 53 Cal.App.3d *360 109, 125 Cal.Rptr. 518 (1975) (emphasis deleted).
In addition, Reid and Inbau have reported that unobserved applications of muscular pressure by a subject may result in misleading indications by the polygraph instrument. In their view, an examiner's unawareness of the possible effects of unobserved muscular pressures could cause him to make an erroneous diagnosis that the subject is telling the truth. Reid & Inbau, supra, at 258.
Consequently, the mere recordation of physiological data, even with the best of instruments, does not alone make the use of polygraphs scientific. To assure reliability, clear, unequivocal evidence about how often and under what circumstances such data permit the accurate detection of deception is also needed. Because of the possibility that several physiological or psychological factors impair the accuracy of the polygraph measurements, such evidence does not exist. Accordingly, we are not persuaded that the physiological stress of lying necessarily produces a series of responses which can be reliably characterized as indicating deception.

B.
The qualifications and competence of polygraph examiners present additional problems. In our view, the absence of adequate qualification standards for the polygraph profession heighten the possibility for grave abuse of the polygraph technique and procedure.
A study of the theory and process of the polygraph examination reveals complexities not present in the fields of fingerprinting, ballistics, and blood testing and analysis all of which are based on known and immutable physical phenomena. The distinction is that polygraphy, albeit based on a scientific theory, remains an art with unusual responsibility placed on the examiner. Although the accuracy of the physiological measurements themselves cannot be challenged if the polygraph instrument is working properly, the recorded information is meaningless in isolation. The polygram itself establishes nothing regarding a subject's truthfulness or deception. Since it is the interpretation of the polygram by the polygraph examiner which leads to such a conclusion, the information on physiological changes necessarily becomes part of a procedure which may be subject to serious error.
Therefore, we believe that the most important factor in the proper use of a polygraph is the ability, experience, education, and integrity of the examiner.[11]Accord, United States v. DeBetham, 348 F.Supp. 1377 (S.D.Cal.1972), aff'd 470 F.2d 1367 (9th Cir. 1972), cert. denied, 412 U.S. 907, 93 S.Ct. 2299, 36 L.Ed.2d 972 (1973). Unless polygraph operators are adequately trained to conduct a proper pretest interview and actual examination, and unless the examiner is experienced in interpreting the polygram, the results of the test are meaningless.[12]
Although several experts who have testified on the issues of admissibility of the polygraph have some training in psychology *361 and medicine,[13] most polygraph operators including many of the recognized "experts" have backgrounds only in law enforcement and investigation. See Note, The Emergence of the Polygraph at Trial, supra, at 1123. The record in this case contains evidence of three different results reached by three different examiners regarding the defendant's truthfulness. Although Stanley M. Slowik is a nationally recognized polygraph examiner, many examiners have limited training and competence, and optimal circumstances for an examination do not always exist. Orne, supra, at 110.
Accordingly, because of the inability to ascertain the competence of polygraph examiners, and because of the lack of standards therefor, polygraph results should not be admitted at trial.

C.
The admission of polygraph evidence at trial is also unwarranted because of the serious interference with and potential prejudice to a jury's evaluation of the demeanor and credibility of witnesses and their testimony. In reaching our decision, we are acutely aware that the polygraph is unlike other scientific evidence, since what it attempts to measurethe truthfulness of a witness or defendantis so directly related to the essence of the trial process.
Initially, due to the unreliability of the polygraph technique and the lack of qualification standards for examiners, there is a serious risk that the admission of polygraph evidence at trial would unfairly prejudice and mislead the jury. Apart from the doubts raised about reliability and competence, however, there is an inherent danger that a jury will rely too heavily on the results of a polygraph test. Because of its aura of scientific infallibility, we believe that jurors are likely to give significant, if not conclusive, weight to a polygrapher's opinion as to whether the accused was truthful in his response to a question regarding a dispositive issue in a criminal case. Accord, United States v. Alexander, 526 F.2d 161 (8th Cir. 1975); United States v. Wilson, 361 F.Supp. 510 (D.C.Md.1973); People v. Leone, 25 N.Y.2d 511, 255 N.E.2d 696, 307 N.Y.S.2d 430 (1969). The polygraph examination should not be used to usurp the jury's function in determining truth by observing the demeanor of a witness in the course of trial. In our view, despite any cautionary instruction or admonition from the court, the jurors' traditional responsibility to collectively ascertain the facts to determine whether guilt has been proven would be prejudiced by the admission of polygraph evidence.[14] If conflicting testimony of two or more polygraph examiners is presented, the question at trial could frequently turn not on the issue of the credibility of all witnesses, but the credibility of the polygraph examiners who tested those witnesses. Note, The Emergence of the Polygraph at Trial, supra, at 1125; People v. Leone, supra; Henderson v. State, 94 Okl.Cr. 45, 230 P.2d 495 (1951), cert. denied, 342 U.S. 898, 72 S.Ct. 234, 96 L.Ed. 673 (1951).

D.
We recognize that other courts have permitted polygraph evidence to be admitted at trial when supported by a prior stipulation of the parties,[15] or in the discretion of *362 the trial judge.[16] In our view, however, such rules do not adequately resolve either the inherent defects in the polygraph technique and procedure, or the difficult questions of admissibility.[17] Because of the lack of any standards for qualification of polygraph examiners, the unreliability of the polygraph technique, and the potential prejudice to the jury process, we conclude that polygraph evidence is not competent and must therefore be excluded.
Accordingly, we adopt the rule that evidence of polygraph test results and testimony of polygraph examiners is per se inadmissible at a criminal trial.
We therefore disapprove the ruling of the trial court.
ROVIRA and LOHR, JJ., specially concur.
ROVIRA, Justice, specially concurring:
I concur in the result but disagree with the Court's opinion that polygraph test results and testimony of polygraph examiners are per se inadmissible at a criminal trial.
We are here dealing with a limited fact situation. The defendant sought the admission of the testimony of the polygraph examiners and the results of the test, and the trial court admitted the testimony over the prosecution's objection.
The majority, by adopting a per se rule, forecloses the admission of such testimony in a criminal trial when the prosecution and defendant stipulate to its admissibility.
I am not prepared at this time to express an opinion as to whether polygraph test results should be admitted if stipulated to by the prosecution and defendant.[1] However, I do not believe that we should foreclose ourselves from considering that question by adopting a per se rule of exclusion at this time. I would not dictate a result in a future case until it is absolutely necessary to do so.
I am authorized to say that Justice LOHR joins me in this special concurrence.
NOTES
[1] Section 18-4-302, C.R.S.1973 (1978 Repl. Vol. 8).
[2] Section 18-3-402, C.R.S.1973 (1978 Repl. Vol. 8).
[3] Slowik is director of the Denver office of John E. Reid and Associates, a polygraph laboratory and training institution.
[4] The autonomic nervous system is comprised of the neural pathways which innervate the heart, some glands, and the smooth muscle in the walls of the digestive tract, respiratory system, excretory system, reproductive system, and blood vessels.
[5] The examiner expects to see a reaction to the control questions in order to insure that the subject is capable of responding and to provide a basis for comparing the level of reaction on the control questions to the relevant questions. Neutral questions are used merely to orient the individual taking the test to any question being asked regardless of the type, e.g., "Is your first name John?" An example of a control question is: "Between the ages of ten and eighteen, did you ever take something that did not belong to you?" An example of a relevant question is: "On October 14, 1981, did you take $5000 from the City National Bank?" 14 Am.Jur. POF 2d 12 (1977); Note, The Emergence of the Polygraph at Trial, 73 Colum.L.Rev. 1120 (1973).
[6] Validity is the degree to which a test predicts or measures accurately that which it is supposed to predict or measure; reliability refers to the degree to which a test consistently yields the same results regardless of the accuracy of the predictions. In order for a test to be valid, it must be reliable. See Tarlow, Admissibility of Polygraph Evidence in 1975: An Aid in Determining Credibility In a Perjury-Plagued System, 26 Hastings L.J. 917, 931 (1975).
[7] Several courts have held all polygraph testimony to be per se inadmissible at trial. See, e.g., United States v. Clark, 598 F.2d 994 (5th Cir. 1979); United States v. Masri, 547 F.2d 932 (5th Cir. 1977), cert. denied, 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249 (1977); United States v. Wainwright, 413 F.2d 796 (10th Cir. 1969); cert. denied, 396 U.S. 1009, 90 S.Ct. 566, 24 L.Ed.2d 501 (1969); Marks v. United States, 260 F.2d 377 (10th Cir. 1958), cert. denied, 358 U.S. 929, 79 S.Ct. 315, 3 L.Ed.2d 302 (1959).
[8] "In police settings, for example, the polygraph is widely used as a means of establishing presumptive innocence. Usually, when a suspect successfully passes the polygraph test ... he is eliminated from serious consideration. Granting that the polygraph has reasonable validity, such a procedure [is useful] ... in husbanding the investigative resources of ... law enforcement agencies. On the other hand, from the point of view of establishing the validity of the instrument, it is catastrophic. If a suspect actually is guilty, but manages to successfully pass the polygraph examination, the likelihood that his guilt will subsequently be correctly identified is greatly diminished since the effort to turn up additional evidence is largely abandoned." Orne, Implications of Laboratory Research for the Detection of Deception, in Legal Admissibility of the Polygraph 99 (N. Ansley ed. 1975).
[9] See, e.g., United States v. Zeiger, 350 F.Supp. 685 (D.D.C.1972), rev'd per curiam, 475 F.2d 1280 (D.C.Cir.1972); United States v. DeBetham, 348 F.Supp. 1377 (S.D.Cal.1972), aff'd 470 F.2d 1367 (9th Cir. 1972), cert. denied, 412 U.S. 907, 93 S.Ct. 2299, 36 L.Ed.2d 972 (1973).
[10] Although we recognize that the pretest interview is partially designed to alleviate these or other factors which may cause inaccurate results, the current lack of standards for polygraph examiners does not insure that pretest interviewing is performed competently or properly. See part IIIB of this opinion.
[11] Reid and Inbau have emphasized the need for basic examiner qualifications to assure the utility and accuracy of the polygraph technique:

"An examiner must be an intelligent person, with a reasonably good educational background preferably a college degree. He should have an intense interest in the work itself, a good practical understanding of human nature, and suitable personality traits which may be evident from his otherwise general ability to `get along' with people and to be well liked by his friends and associates. No amount of training or experience will overcome the lack of these necessary qualifications." J. Reid & F. Inbau, Truth and Deception: The Polygraph ("Lie-Detector") Technique 304 (2d ed. 1977).
[12] For example, "while in truly expert hands, the pretest interview is carried out in a manner which assures optimal conditions for the polygraph test, one can readily conceive of situations where inappropriate handling of the pretest situation can produce charts leading to false [results]." Orne, Implications of Laboratory Research for the Detection of Deception, in Legal Admissibility of the Polygraph 99 (N. Ansley ed. 1975), at 113-114.
[13] See, e.g., United States v. Zeiger, 350 F.Supp. 685 (D.D.C.1972), rev'd per curiam, 475 F.2d 1280 (D.C.Cir.1972).
[14] The defendant asserts that, since eyewitness testimony is not precluded from admission at trial, with a reported 35% accuracy rate, polygraph evidence should also be admitted since its accuracy rate is much higher. See 8 Colo.Law. 1038 (August 1979). However, although other fallible evidence, such as eyewitness identification, is admissible at trial, the jury is still able to evaluate such testimony based on common sense and ordinary experience; its function is not compromised. Such is not the case with polygraph results or testimony of polygraph examiners, which is beyond the realm of an ordinary juror's experience.
[15] See, e.g., State v. Valdez, 91 Ariz. 274, 371 P.2d 894 (1962); State v. Marti, 290 N.W.2d 570 (Iowa 1980); Pavone v. State, Ind., 402 N.E.2d 976 (1980); People v. Trujillo, 67 Cal. App.3d 547, 136 Cal.Rptr. 672 (1977); People v. Saffold, 47 Ill.App.3d 934, 8 Ill.Dec. 286, 365 N.E.2d 524 (1977).
[16] See, e.g., People v. Barbara, 400 Mich. 352, 255 N.W.2d 171 (1977); United States v. Marshall, 526 F.2d 1349 (9th Cir. 1975), cert. denied, 426 U.S. 923, 96 S.Ct. 2631, 49 L.Ed.2d 376 (1975); United States v. Infelice, 506 F.2d 1358 (7th Cir. 1974), cert. denied, 419 U.S. 1107, 95 S.Ct. 778, 42 L.Ed.2d 802 (1974).
[17] See Colorado Rules of Evidence 401, 402, and 403:

Rule 401. Definition of "Relevant Evidence" "`Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to determination of the action more probable or less probable than it would be without the evidence." Rule 402. Relevant Evidence Generally Admissible; Irrelevant Evidence Inadmissible.
"All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Colorado, by these rules, or by other rules prescribed by the Supreme Court, or by the statutes of the State of Colorado. Evidence which is not relevant is not admissible."
Rule 403. Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time.
"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence."
[1] See footnote 15 of the majority opinion.