The PEOPLE of the State of Colorado,
Plaintiff-Appellant,

v.

Pete James CUMMINGS,
Defendant-Appellee.

No. 85SA39.

Supreme Court of Colorado.

Sept. 23, 1985.

James F. Smith, Dist. Atty., Seventeenth Judicial Dist., Steven L. Bernard, Chief Trial Deputy Dist. Atty., Brighton, for plaintiff-appellant.

David F. Vela, Colorado State Public Defender, Ronald M. Aal, Deputy State Public Defender, Brighton, for defendant-appellee.

DUBOFSKY, Justice.

In this interlocutory appeal under C.A.R. 4.1, the People assert that the Adams County District Court erred in suppressing as involuntary certain statements made by the defendant and in suppressing certain evidence found during the execution of search warrants. We reverse.

The bodies of a man and a woman, apparently murder victims, were found in a parked Toyota Corolla on September 4, 1984. Both victims had been shot and stabbed numerous times. Late that afternoon, the defendant, Pete James Cummings, called the Aurora Police Department after seeing a newcast about the discovery of the bodies and stated that he could identify them. Meanwhile, police detectives had identified one of the victims as Joe Watkins, and while the detectives were searching Watkins' residence late the same afternoon, the defendant called to speak to Watkins. The detective who answered the phone identified himself as a police officer, and the defendant asked the officer to come to the defendant's house to speak with him. Shortly thereafter, two detectives went to the defendant's home and talked with him for approximately one hour. Gloria Falls, whom the defendant introduced as his wife, was present during the conversation.[1] The defendant identified the murder victims as his niece and a friend, Watkins, and stated that they had been at the defendant's house the evening before the bodies were found.

The next morning two police detectives went to the defendant's home and asked him to come with them to the Aurora police station. The defendant agreed, and the officers and the defendant arrived at the station shortly before 10:00 a.m. The officers escorted the defendant to a small interview room containing a table and chairs.

One of the detectives informed the defendant of his *Miranda* rights and told him that he was not required to remain at the police station and that he could leave at any time. The defendant signed a waiver of his rights and spoke with the detective for about half an hour.

The detective and a police sergeant then asked the defendant to sign a consent form allowing them to search his house, and the defendant signed the form. The defendant remained at the police station with another officer while the detective and the sergeant went to search his house. While at the station, the defendant encountered members of the victims' families who yelled at him and tried to hit him.

At about 1:00 p.m., the police officers returned from the defendant's home and reminded the defendant of his *Miranda* rights, again advising him that he could leave the police station at any time. The detective spoke with the defendant for about an hour and a half, questioning him about discrepancies in his various statements and about evidence that might link him to the scene where the bodies were found including bloody fingerprints on the Toyota, a .22 caliber bullet found next to the mattress of a waterbed in the defendant's home, and the fact that carpet covering the woman's body in the car matched carpet on the patio and in the garage at the defendant's home. The detectives had discovered that a portion of the carpet covering the defendant's garage floor had been removed, revealing a section of foam carpet pad that was the same size as the piece of carpet covering the body.

At the suppression hearing, the detective testified that he did not yell at the defendant during the afternoon interview, but that he might have raised his voice when he told the defendant that he did not believe him because of the discrepancies in his statements. During the afternoon interview, the defendant provided different information than he had at the earlier inter-

---

1. At the hearing where the district court suppressed the statements and evidence at issue in this appeal, the court also found that Gloria Falls was the defendant's common law wife. The latter ruling is not subject to interlocutory appeal under C.A.R. 4.1.

views and wrote out a statement at the request of the detective, although the detective told him that he was not compelled to do so and that the statement might be used against him in court.

The defendant requested a polygraph examination, and the detective arranged an examination with the police department's polygraph technician. The detective also provided lunch for the defendant before the examination. The polygraph technician preceded the polygraph testing with a repeat of the defendant's *Miranda* rights and a pre-examination interview, which were tape-recorded and transcribed. The defendant made further statements about the evening preceding the discovery of the victims' bodies during the pre-examination interview. The interview and polygraph examination lasted almost two hours. Afterward, the police detective informed the defendant that he was a suspect in the case, and, without questioning the defendant further, arranged a ride home for him.

A few weeks later, on September 28, 1984, another detective obtained a warrant to search the defendant's house. The affidavit accompanying the application for the warrant included evidence obtained from the interviews with the defendant and indicated that testing had revealed that the bullet found in the waterbed matched a bullet removed from one of the victims' bodies. The warrant specified certain property that could be seized and also allowed the police to measure the interior house and garage dimensions and take photographs of the interior of the house and garage. During the search, conducted on September 28th, the detective seized a jar of .22 caliber bullets sitting in plain view on a dresser next to the waterbed.

After this search, police officers spoke with Gloria Falls. Falls told the officers that on the evening of September 3, 1984, the victims had visited the house where Falls and the defendant lived. She stated that the defendant became upset, obtained a rifle from the bedroom, and shot the victims who were seated on a brown couch in the living room. The defendant then dragged the bodies to the garage, came back to the kitchen to get a knife "to finish Joe off," and returned to the garage. According to Falls, the defendant put the bodies in the Toyota and drove it to the place where it was discovered the next day. An affidavit accompanying an application for a second search warrant detailed this conversation.

The second search warrant, also obtained on September 28th, authorized a search of the house and garage for, among other things, a "brown fur couch and bloodstains." The affidavit accompanying the search warrant indicated that officers had seen bloodstains on foam carpet padding in the garage. Later on September 28th, while looking in the garage for bloodstains, a police officer explored among the rafters where bloodstained rags might have been hidden. He noted that what appeared to be a shelf above a table in the garage was actually a piece of plywood nailed vertically between two wallstuds, with three containers balanced on the edge of the plywood against the wall of the garage. The officer noted a possibly bloodstained nail above the plywood. He removed the containers and pulled the plywood away from the wall, finding something wrapped in black mesh behind the plywood. After unraveling the black mesh, he found and seized a .22 caliber rifle.

After the defendant was charged with the two murders, he filed a motion to suppress all the statements he made to police officers and the evidence seized during the two searches on September 28th.[2] The prosecution wished to introduce at trial the defendant's statements on September 5th to the polygraph examiner during the interview preceding the polygraph test, after editing the statements to remove any reference to the polygraph. The district court,

**2.** The district court ruled that the statements made by the defendant over the telephone, in his home, and at the police station on the morning of September 5th were voluntary and admissible. The court also ruled that all items seized during searches, with the exception of the jar of bullets, the rifle, and a box for the rifle, would be admissible at trial.

relying on *People v. Anderson,* 637 P.2d 354 (Colo.1981), in which we held that evidence of polygraph results is *per se* inadmissible in a criminal trial, held that none of the statements the defendant made to the polygraph examiner were admissible because the nature of the testing atmosphere made them involuntary. The court also suppressed the statements made by the defendant in the interview during the afternoon of September 5th, after the consent search of his house, finding that they were not voluntary because they were obtained after the defendant had been at the police station for a long time. The district court suppressed the jar of .22 caliber bullets and the rifle as well because it concluded that these items were not found in plain view during a search authorized by warrant. The People request reversal of each of the district court's suppression rulings.

### I.

■ The People first protest the trial court's suppression of the defendant's statements during the September 5th afternoon interview as involuntary. To determine whether a statement is voluntary, a court must evaluate the totality of the circumstances surrounding the making of the statement. *People v. Raffaelli,* 647 P.2d 230 (Colo.1982); *People v. Scott,* 198 Colo. 371, 600 P.2d 68 (1979); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The prosecution bears the burden of establishing by a preponderance of the evidence that a defendant's statement was voluntary. *Raffaelli,* 647 P.2d at 235. Statements may not be admitted if they were obtained through promises, threats, violence, or any other improper influence. *People v. Freeman,* 668 P.2d 1371 (Colo. 1983); *Scott,* 198 Colo. at 373, 600 P.2d at 69; *People v. Quintana,* 198 Colo. 461, 464, 601 P.2d 350, 351 (1979); *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). The fact of custody alone is not sufficient to render statements involuntary, *People v. Helm,* 633 P.2d 1071 (Colo.1981), and questioning a suspect over a period of time does not automatically render his statements involuntary. *People*

*v. Davis,* 194 Colo. 466, 573 P.2d 543 (1978). A reviewing court is bound by the trial court's findings of fact on voluntariness, but the appellate court may not ignore uncontradicted credible evidence in the record. *People v. Freeman,* 668 P.2d 1371 (Colo.1983).

■ In the present case, the defendant did not present any evidence indicating that his statements were involuntary or the result of coercion. The district court did not cite any evidence, other than noting that the defendant was at the police station for a long time, to support its finding that the statements following the consent search of the defendant's house were involuntary. The uncontradicted evidence in the record is that the defendant willingly accompanied the police officers to the police station. He remained at the police station for about eight hours, but spoke with police officers three times in interviews totalling less than four hours. He was reminded of his *Miranda* rights before each interview and repeatedly was told that he was free to leave.

The only indication of anything that might have rendered the defendant's statements involuntary was the attempted assault by relatives of the victims. The police officer who spoke with the defendant after this incident, however, testified that the defendant did not appear frightened although he was concerned that he might meet those people again at the police station. The officers who interviewed the defendant indicated that he appeared relaxed and that the defendant stated that he understood his rights before each interview. There is no evidence in the record to support the trial court's finding that the statements made by the defendant during the interview on the afternoon of September 5th were involuntary, and we determine that those statements were voluntary and admissible at trial.

### II.

#### A.

■ The defendant maintains that the suppressed polygraph statements are not a

proper subject for review under C.A.R. 4.1. Under C.A.R. 4.1, the prosecution may obtain pretrial review only of suppression of physical evidence or confessions or admissions made by the accused. *People v. Dailey*, 639 P.2d 1068, 1076 n. 8 (Colo.1982); *People v. Fidler*, 175 Colo. 90, 485 P.2d 725 (1971); C.A.R. 4.1(a).[3] In *People v. Lindsey*, 660 P.2d 502 (Colo.1983), this court refused to review a pretrial suppression of statements made to a polygraph examiner because the suppression was not based on Crim.P. 41. The trial court in *Lindsey* found that the statements to be suppressed were voluntary, but would not admit them because the statements were so intertwined with references to the polygraph examination and with the examination itself that the court felt they could not be separated for trial. We held that the *Lindsey* trial court ruling was not a suppression of evidence under Crim.P. 41, but a pretrial evidentiary ruling, which is not reviewable under C.A.R. 4.1. 660 P.2d at 505.

In the present case, the district court found that the statements made by the defendant before the polygraph examination were not voluntary. Therefore, the district court grounded its ruling on Crim.P. 41(g),[4] and we may review the suppression of the defendant's statements to the polygraph examiner under C.A.R. 4.1.

### B.

In *People v. Anderson*, 637 P.2d at 358, we held that "any evidence of polygraph results and testimony of polygraph examiners is *per se* inadmissible in a criminal trial." We reached this conclusion because of the inherent unreliability of polygraph results, the inability of trial courts to judge the competence of polygraph examiners, and the tendency of juries to rely too heavily on "expert" testimony of truthfulness.

*Id.* at 358. We noted that the unreliability of polygraph examination results arose in part from "a subject's fear of physical harm from the instrument or concern about the scope of the examiner's questioning." *Id.* at 359. In the instant case, the district court considered this language from *Anderson* and concluded that all of the statements made by the defendant to the polygraph examiner, both in the pretest interview and during the examination were inadmissible because "it must have been a confusing and fear-heightening type of situation for Mr. Cummings."

■ Our analysis in *Anderson* of the potential sources of unreliability in polygraph examinations did not lead to a conclusion that all statements made in polygraph examinations are involuntary. The factors that make the results of polygraph examinations unreliable and inadmissible do not necessarily apply to statements made to a polygraph technician during a pre-examination interview. Other courts that have addressed the voluntariness of statements made before, during, or after polygraph examinations have concluded that a polygraph examination is not inherently coercive. *Sotelo v. State*, 264 Ind. 298, 342 N.E.2d 844 (1976); *Johnson v. State*, 31 Md.App. 303, 355 A.2d 504 (1976); *Lee v. State*, 338 So.2d 395 (Miss.1976); *State v. Cannon*, 260 S.C. 537, 197 S.E.2d 678, *cert. denied*, 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973); *State ex rel. Weston v. Henderson*, 220 Tenn. 1, 413 S.W.2d 674 (1967); *State v. Rupe*, 101 Wash.2d 664, 683 P.2d 571 (1984); *McAdoo v. State*, 65 Wis.2d 596, 223 N.W.2d 521 (1974). The fact that a statement is made during a polygraph examination does not establish coercion, but may be considered among other factors in determining voluntariness under the circumstances. *See*

---

**3.** C.A.R. 4.1(a) provides in part:
  The state may file an interlocutory appeal in the supreme court from a ruling of a district court granting a motion under Crim.P. 41(e) and (g) and Crim.P. 41.1(i) made in advance of trial by the defendant for return of property and to suppress evidence or granting a

motion to suppress an extra-judicial confession or admission; . . .

**4.** Crim.P. 41(g) provides in part:
  A defendant aggrieved by an alleged involuntary confession or admission made by him, may make a motion under this Rule to suppress said confession or admission.

*People v. Wilson,* 78 Misc.2d 468, 354 N.Y. S.2d 296 (County Ct.1974).

■ Nothing in the record of this case suggests that the defendant was confused and frightened by the polygraph examination or the events leading up to it. As noted above, a police officer arranged the polygraph examination at the defendant's request. An officer bought the defendant lunch before the examination. The polygraph technician readvised the defendant of his *Miranda* rights on a printed form before the pre-examination interview. We conclude that there is no evidence in the record supporting the district court's determination that the defendant's statements to the polygraph examiner were involuntary. The statements made by the defendant to the polygraph technician, if edited to remove references to the polygraph examination itself, are admissible. *See United States v. McDevitt,* 328 F.2d 282 (6th Cir. 1964); *Roberts v. State,* 195 So.2d 257 (Fla. Ct.App.1967); *People v. Stevens,* 11 Ill.2d 21, 141 N.E.2d 33 (1957); *State v. Bowden,* 342 A.2d 281 (Me.1975); *People v. Rhodes,* 102 Misc.2d 377, 423 N.Y.S.2d 437 (N.Y. Sup.Ct.1980); *Fernandez v. State,* 172 Tex. Crim.App. 68, 353 S.W.2d 434 (1962); *Jones v. Commonwealth,* 214 Va. 723, 204 S.E.2d 247 (1974); *Rupe,* 101 Wash.2d 664, 683 P.2d 571.

### III.

The People further protest the district court's suppression of the jar of .22 caliber bullets and the rifle. The district court held that these items were not found in plain view during searches for the items listed in the search warrants. Specifically, the court ruled that the officers did not need to go into the bedroom during the first search on September 28th and had they not gone into the bedroom, they would not have seen the jar of bullets. With respect to the rifle found during the second search on September 28th, the court ruled that it was not in plain view and was discovered during a general search.

■ Three requirements must be met before police officers may seize an item in plain view: the officers must possess a valid reason for the intrusion that places the item in plain view, discovery of the item must be inadvertent, and the officers must have a reason to connect the item with criminal activity. *People v. Stoppel,* 637 P.2d 384 (Colo.1981); *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); *Coolidge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). The defendant acknowledges that the police officers had reason to believe that both the rifle and bullets were connected with the crime under investigation, but maintains that the intrusions into the areas in which the items were found were not legal and that the items were not found "inadvertently."

■ The bullets were found during the execution of a valid warrant that authorized police officers to search the defendant's house in order to measure the interior dimensions and take photographs. Upon entering the bedroom, the jar of bullets was plainly visible on a dresser next to the bed. Contrary to the ruling of the district court, the terms of the search warrant allowed the officers to enter the bedroom to measure its dimensions. The discovery of the jar was inadvertent because the officers did not have probable cause to believe that they would find a jar of bullets in the bedroom. *Stoppel,* 637 P.2d at 390; *Coolidge,* 403 U.S. at 470, 91 S.Ct. at 2040. Therefore, the jar of bullets should not have been suppressed.

The police seized the rifle in the course of execution of a valid search warrant that authorized a search for "bloodstains." As outlined in the affidavit accompanying the application for the search warrant, the fact that the victims had been shot twelve times and stabbed supported an inference that a significant amount of blood would have stained the area where the crimes were committed. A police search for bloodstained rags in the garage, where bloodstained foam carpet padding had been found, did not extend beyond the scope of the search warrant.

Moreover, as the United States Supreme Court has stated:

> A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapons might be found. A warrant to open a footlocker to search for marihuana would also authorize the opening of packages found inside.... When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers ... must give way to the interest in the prompt and efficient completion of the task at hand.

*United States v. Ross,* 456 U.S. 798, 820–21, 102 S.Ct. 2157, 2170, 72 L.Ed.2d 572 (1982) (footnotes omitted). Here, the hiding place where the gun was found wrapped in black mesh might have contained bloodstained rags wrapped in black mesh. Therefore, police intrusion into that area and unraveling the black mesh was valid under the search warrant. The rifle was discovered in a place where the police officers lawfully could search, *see People v. Hearty,* 644 P.2d 302 (Colo.1982); *People v. Franklin,* 640 P.2d 226 (Colo.1982), and its discovery was inadvertent, since the police had no reason to believe they would find the gun in that location while executing the search warrant. Therefore, there was no prohibition against the rifle's seizure under the plain view doctrine.

Order reversed.