THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
HUGH CAMPBELL, Appellant.

Second Department, June 29, 1981

APPEARANCES OF COUNSEL

*Rudy Hirschheimer* for appellant.

*John J. Santucci, District Attorney (Deborah Carlin
Stevens* of counsel), for respondent.

OPINION OF THE COURT

GIBBONS, J.

While on motor patrol on August 11, 1977 at about 12:30
A.M., Police Officer George Rice received a call that shots
were fired at premises located at 92-41 190th Street, in
Queens. He proceeded to that location with his partners,
Sergeant Winter and Police Officer Gilbert. Upon arriving
and receiving information that someone had been seen on

the roof, Officer Rice received permission from a tenant to go through her apartment to the fire escape which gave access to the roof.

On his way to the roof, Officer Rice observed the defendant peering down. As the officer approached, the defendant said, "That is all right, Officer, I am only walking my dog." Officer Rice told him to keep his hands in view, and he completed his ascent to the roof. It was dark and the weather was clear and warm.

When Officer Rice arrived on the roof, he saw the defendant standing there without shirt or shoes. He was attired only in a pair of coveralls. He had a dog with him. When asked if he had heard anything, the defendant told Officer Rice that he had heard a few shots fired. At that moment Sergeant Winter and Officer Gilbert arrived, coming through two entrances from separate stairwells, which, they said, had been locked from the inside.

Leaving his brother officers with the defendant, Rice noticed that the door to the elevator motor room was open. He looked inside. The beam of his flashlight illuminated the floor, where Rice saw a .38 caliber chrome-plated revolver, which was fully loaded. Picking it up by the trigger guard, Rice walked back to the defendant who was standing with the other officers. He testified how he then proceeded to give the defendant his *Miranda* advices in the following manner:

"A You have a right to remain silent. Anything he said may be used against him in a court of law. You have the right to have an attorney present during any questioning. If you could not afford an attorney, one will be provided without cost. If you have an attorney available, you do not have to speak to us before you have an attorney.

"Q What did you say then?

"A Do you understand? He said, 'Yes'.

"Q Did he understand the whole thing, or each one of the statements you made?

"A Does he understand his rights.

"Q What did you say to him—'Do you understand, do you understand your rights, do you understand what I just said to you?'

"A I said, 'Do you understand?'.

"Q What did he say?

"A 'Yes'."

Officer Rice's testimony concerning what ensued immediately after the defendant stated that he "understood" the *Miranda* warnings is as follows:

"Q What did you say *next?*

"A I told him, 'I will take these fingerprints off this gun, and if it is your gun, you ought to tell us.'

"Q Then what?

"A He said, 'It is my gun.'

"Q Next?

"A (continuing) And I said, 'What happened?', and he told us."

The defendant then told Officer Rice that he had been in his apartment that evening with his girlfriend, when he heard a knock on the door. The knock was followed by two shots into the door. He was struck by some wood splinters. Afraid, he grabbed his gun and went through the window to the fire escape. He went up to the roof while his girlfriend descended the fire escape.

Following his inculpatory statement, the defendant was placed under arrest, handcuffed, and taken down the roof stairway to his apartment in the custody of the three policemen. In the meantime, two uniformed police officers also arrived at the apartment. The officers requested access to the apartment for the purpose of getting shoes for the defendant, who was barefooted, so that he could be taken to the police station.

The testimony of Officer Rice concerning this aspect of the matter is as follows:

"Q Didn't he tell you that the only way to get into the apartment, since he didn't have the key, was through the window?

"A I asked him how else could we get into the apartment to get his shoes. He said, 'You have to go up the roof and through the fire escape.'"

Officed Rice described how he and Sergeant Winter obtained access to the apartment while the defendant re-

mained in the custody of Officer Gilbert in the hall, and what they discovered therein, in the following testimony: "A At his apartment door, one bullet apparently went through the door. I said, 'Do you have a key?', and he said, 'No.' My partner stated, 'I hope you get in the apartment,' and I asked if we could go through the window, and he said we could, and my partner stayed with him. Sgt. Winter and myself went back up to the roof, across the roof and went down the fire escape and entered the apartment through the open window from the fire escape. As I was walking from the fire escape, from the entrance of the window to the front door, I observed on the kitchen table, a quantity of marijuana packaged in manila envelopes."

When Officer Rice emerged after opening the door to permit the defendant and Officer Gilbert to enter, he described his ensuing conversation with the defendant as follows:

"A I asked him if he had any more narcotics in the apartment, and he said no. I told him if he is lying we will call the dogs down from the Narcotics Squad to sniff out the marijuana, and I said, 'Can we search?', and he said we could.

"As we searched the apartment, I recovered money from the refrigerator and I believe the closet in the hallway."

In addition to the currency, which totaled $753, the search also uncovered a box with a gun manufacturer's label on it, imprinted with the same serial number and model as that of the revolver recovered on the roof. The box also contained a receipt from a pawnshop in Athens, Georgia, with the serial number of the gun written on it.

Because of a progression of intrusions upon the defendant's constitutional rights under the Fourth and Fifth Amendments, the judgment of conviction herein should be reversed.

The first question presented for resolution is whether, under the factual posture of this case, the defendant, knowingly and intelligently, waived his constitutional right against self incrimination after Officer Rice had imparted the *Miranda* advices to him.

Here, the continuity of the events following the giving

of the *Miranda* advices was: first, the defendant's statement that he "understood" them; second, and immediately following, the police officer's *admonition*, while showing him the gun, that if it were his, he should say so before fingerprints will be taken from it; and third, following such remark, the defendant's immediate admission that the gun was his, whereupon he was placed under arrest and handcuffed.

Although this record reveals that the defendant declared that he "understood" the *Miranda* warnings, it is totally devoid, however, of any showing of any express waiver of this constitutional right as mandated by *Miranda v Arizona* (384 US 436; see *People v Schroder*, 71 AD2d 907; *People v Vigliotti*, 75 AD2d 859), or of a waiver by implication from his conduct under the rule expressed in *North Carolina v Butler* (441 US 369; see, also, *Fare v Michael C.*, 442 US 707, 724-728; *People v Norris*, 75 AD2d 650).

When a defendant is in police custody and after the *Miranda* warnings have been given to him, a heavy burden is cast upon a State to establish not only an understanding of his constitutional rights, but also that his election to waive them was the result of the voluntary exercise of his own mental processes without the use of any outside influences or pressures which may tend to exert any leverage upon his ultimate decision.

Inasmuch as it is a well-settled rule of law "that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights" *(Johnson v Zerbst*, 304 US 458, 464), it becomes a natural corollary to such rule that courts are required to scrutinize such waivers for any signs of unfairness, and for an assurance that they are not the product of any overwhelming and unbalancing inducements.

The defendant's inculpatory statement, coming immediately after Officer Rice's admonition, was the result of an impermissible intrusion on the defendant's right to make an unpressured and uninfluenced election whether he should or should not waive his constitutional rights.

In *Miranda v Arizona* (384 US 436, *supra)*, the Supreme Court of the United States established the guidelines

to be applied by all courts to determine whether a defendant, while in police custody, has knowingly and voluntarily waived his constitutional right against self incrimination and his right to counsel during such custodial interrogation.

The rights therein sought to be protected, involve not only a statement of the defendant's rights but, most vital to him, a comprehension of the advices coupled with a reasonable opportunity on his part to consider the consequences of the options offered to him and to make his choice whether or not to waive his rights without any intervening pressure, cajoling or implied threats by his interrogator.

This rule was further defined by the Supreme Court in *North Carolina v Butler* (441 US 369, 373, *supra*), where it was held that an express waiver is not indispensible within the contemplation of *Miranda v Arizona (supra)*, and that it may be inferred from "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver". Nevertheless, such inference may not be entertained where, as here, there is a showing that the defendant's decision whether to waive or not was preceded by the intervening persuasive tactics of the police interrogator which tended to diminish and impair the defendant's volition.

This deficiency was created here by the inappropriate timing of the police officer's remark in that it was made after the defendant indicated his comprehension of the warnings but before he had made an election to waive. The only inference from such conduct by the interrogator is that the remark was made for the purpose of introducing "a compelling influence" to induce a waiver, which is contrary to the purpose of the *Miranda* guidelines.

It is not to be suggested that at some point in a police interrogation, under certain circumstances, it would be inappropriate for the interrogating officer to suggest the use of police testing techniques, as, for example, in *People v Tarsia* (50 NY2d 1), where the Court of Appeals held, under the facts of that case, that a confession following a voice stress test was not inadmissible. However, it should be sharply noted that in *People v Tarsia (supra)*, the defendant had been given the *Miranda* warnings and had,

in fact, *already waived his rights* before the voice stress test was mentioned by the police interrogator.

Notwithstanding that the suggestion to submit the defendant to police detection techniques may be permissible *after* a waiver of constitutional rights by the defendant, it may not, however, in the very process designed to protect one's constitutional rights, be used as a device to overbear, pressure and persuade the defendant to relinquish those rights.

Here, however, we are concerned with, not a police technique to evoke a statement after a waiver has been properly effectuated, but, rather, with an intrusion upon the very foundation of the defendant's constitutional right to make a free choice as to whether or not he should waive in the first instance. This phase of the constitutional process requires an atmosphere geared to the protection of constitutional rights rather than a concern with overcoming such rights.

Certainly, this case represents a less compelling factual pattern for finding a waiver than in either *People v Vigliotti* (75 AD2d 859, *supra*) or in *People v Schroder* (71 AD2d 907, *supra*), where the response of "I understand" by both defendants, without more, was held to be insufficient because such words were not followed by an expressed waiver or conduct from which a waiver could be inferred (cf. *People v Norris*, 75 AD2d 650, *supra*).

Particularly do the facts militate against a waiver here when no matter how innocuous the police prodding may have appeared, such urging by-passed any expression of waiver and resulted in a statement devoid of surrounding circumstances from which any inference of relinquishment of such constitutional rights could be inferred.

Contrary to the view expressed by our learned, separately concurring colleague, the suppression of the defendant's statement is not entirely dependent on our holding in either *People v Schroder (supra)* or *People v Vigliotti (supra)*, nor may it be said that the instant case is functionally indistinguishable from those cases. The issue presented and determined here pertains specifically to police conduct, following the giving of the *Miranda* warnings, which interfered

with the defendant's right to freely determine whether he would waive his constitutional rights by injecting a threat to subject the weapon to fingerprint analysis in order to induce him to make such waiver. It is in this factual respect in which this case differs particularly from both *People v Schroder (supra)* and *People v Vigliotti (supra)*, although a waiver was lacking in both of them, as it was in this case.

In *Schroder (supra)*, the defendant was advised of his constitutional *(Miranda)* rights and stated that he understood each. The officer then asked him whether he wished to answer questions without an attorney present. The defendant made no reply. Nevertheless, the officer proceeded to question him concerning the crime and elicited certain inculpatory statements. We held that the statements should have been suppressed not merely because the defendant failed to make an express waiver of his right to remain silent, but because *he had refused to make such a waiver when directly asked to do so*. This refusal, in our view, was tantamount to an invocation of the defendant's right to have his attorney present during questioning—a right which could not be deemed waived solely by the defendant's subsequent participation in the interrogation process.

In *Vigliotti (supra*, p 859) we ordered the suppression of certain statements on the ground that the record did not indicate that the defendant had "waived his rights, either by express statement * * * or by conduct". (Emphasis supplied.) The record in *Vigliotti* reveals that, as in *Schroder*, the defendant expressed his understanding of his constitutional rights, and was then asked whether he wished to say anything. The officer, however, testified that he could not recall the defendant's reply to that question. Hence, the People failed to establish, as was their burden, that a defendant, who had been *explicitly asked to waive his rights*, had agreed to do so.

In contrast, we declined to order suppression in *People v Norris* (75 AD2d 650, *supra*). There, as in *Schroder*, the defendant, having been advised of his rights, failed to respond when asked if he wished to speak with the officer without an attorney present. Nevertheless, we found that it was a waiver of his right to have an attorney present because,

when initially advised of his right to counsel, the experienced defendant had said, "I'll get a lawyer when I'm ready" (75 AD2d, at p 651).

In affirming in *Norris*, we quoted from *North Carolina v Butler* (441 US 369, 373, *supra*), in which the Supreme Court wrote: "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. As was unequivocally said in *Miranda*, mere silence is not enough. *That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecutor's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.*" (Emphasis supplied.) We then utilized the approach suggested by the Supreme Court in *Fare v Michael C.* (442 US 707, 724-725, *supra*) by examining "the totality of the circumstances surrounding the interrogation", and concluded that the statement was admissible.

More recently, we took the very same approach in affirming the conviction of a defendant who had likewise failed to make an express waiver of his constitutional rights. (See *People v Baez*, 79 AD2d 608.)

Hence, it is apparent that the law, at least in this department, is precisely as our separately concurring colleague would have it, viz., that "where * * * a defendant in custody has been fully informed of his rights *and has indicated that he understands them*, his subsequent voluntary decision to speak to the police without requesting an attorney *may*, in all but the most unusual circumstances, be held to constitute a valid waiver". (Emphasis supplied.) In the case at bar, therefore, the defendant's roof-top admission was not necessarily excludable solely because it was not preceded by an express waiver of his constitutional rights. That fact not-

withstanding, the admission must be suppressed because, under the totality of the circumstances herein, the defendant was not shown to have waived his rights beyond a reasonable doubt. The record here does not spell out a free and voluntary waiver, either express or implied, of the defendant's constitutional rights. (Cf. *People v Leonard*, 59 AD2d 1; *People v Zimmer*, 68 Misc 2d 1067, affd 40 AD2d 955.)

Turning, lastly, to the question which concerns the right of the police to enter the defendant's apartment, in the first instance, when 30 manila envelopes of marijuana were observed in open view on the kitchen table, and the subsequent search which uncovered the money and the gun manufacturer's box with the sales receipt, it is obvious that the items of property thus revealed were the result of the exploitation of the primary illegality flowing from the statement obtained from the defendant in violation of his constitutional rights and, therefore, were tainted evidence which should have been suppressed and not used at the trial. (See *Wong Sun v United States*, 371 US 471; *People v Robinson*, 13 NY2d 296, 301.)

The judgment must be reversed, on the law and the facts, and the motion to suppress granted.

GULOTTA, J. (concurring). I concur in the result on constraint of *People v Schroder* (71 AD2d 907).

In my view, the case at bar is functionally indistinguishable from *People v Schroder (supra)* in terms of the efficacy of the defendant's "waiver" of his *Miranda* rights (cf. *People v Vigliotti*, 75 AD2d 859), and on that basis I am constrained to agree that the inculpatory statement made to Officer Rice at the scene of defendant's arrest, as well as the physical evidence thereafter obtained from his apartment, were improperly ruled admissible.

Contrary to the views expressed by the majority, I cannot accede to their attempt to distinguish *People v Schroder (supra)* on the ground that the defendant therein was specifically asked to waive his *Miranda* rights, as the foregoing would only tend to place an unwarranted premium upon the willful or negligent failure of the police to ask a defendant in custody to *expressly* waive his rights with the aim of securing an eventual waiver by conduct. Stated differently,

it would appear that if *People v Schroder (supra)* is to be read to mean that once a defendant in custody has been asked to waive his *Miranda* rights, a failure on his part to answer the question will be deemed tantamount to an invocation of his right to have an attorney present, thereby foreclosing the prospect of further inquiry, I am afraid that the likely result will be a marked decrease in the number of cases in which the question will be asked in the first instance. This, in my view, would constitute a highly undesirable state of affairs, for, as we recently observed in *People v Harris* (79 AD2d 615, 616), "it would be far better if the police were to elicit an express waiver of constitutional rights before questioning one who is in custodial detention." Moreover, unlike my brethren in the majority, I am not convinced that the officer's statement regarding the ability to test the gun for fingerprints was coercive under the facts of the instant case or had any tendency whatsoever to overbear the defendant's will (see *People v Gaines*, 41 AD2d 742; cf. *People v Tarsia*, 50 NY2d 1). The defendant, in fact, never so claimed before the motion court, but maintained, *inter alia*, that he had never been advised of his rights and had never admitted ownership of the gun. Finally, assuming, *arguendo*, that the officer's remark was somehow "provocative", I am compelled to point out that this factor, standing alone, still "does not tell us that the confession that quickly followed was any more than the product of the permissible intimation that it was useless for [the defendant] to conceal his culpability any longer" *(People v Tarsia, supra,* p 12).

Were I writing upon a "clean slate", however, I would be disposed to hold in accordance with the courts of a number of our sister jurisdictions that where, as here, a defendant in custody has been fully informed of his rights *and has indicated that he understands them,* his subsequent voluntary decision to speak to the police without requesting an attorney may, in all but the most unusual of circumstances, be held to constitute a valid waiver (see, e.g., *Blackmon v Blackledge*, 541 F2d 1070 [CCA4th]; *United States v Montos*, 421 F2d 215 [CCA5th], cert den 397 US 1022; *United States v Ganter*, 436 F2d 364 [CCA7th]; *United States v Marchildon*, 519 F2d 337 [CCA8th]; *Hughes v Swenson*, 452 F2d 866 [CCA8th]; *United States v Moreno-Lopez*, 466

F2d 1205 [CCA9th]; *Bond v United States*, 397 F2d 162 [CCA10th]; *Mitchell v United States*, 434 F2d 483 [CCA DC], cert den 400 US 867; *State v Pineda*, 110 Ariz 342; *People v Johnson*, 70 Cal 2d 541; *People v Weaver*, 179 Col 331; *People v Brooks*, 51 Ill 2d 156; *Commonwealth v Murray*, 359 Mass 541; see, also, *North Carolina v Butler*, 441 US 369, 373, 375, n 6; *United States v Boston*, 508 F2d 1171 [CCA2d]; cf. *People v Schroder, supra).* Upon such an analysis, I would therefore conclude that where, as in the case at bar, a 27-year-old predicate felon has been taken into custody and carefully apprised of his rights, we may take from his on-the-scene admission of understanding that he truly comprehends their meaning, and that his subsequent decision to speak to the police without the presence of an attorney constituted a knowing and intelligent waiver (see *People v Gaines*, 41 AD2d 742, *supra).*

*People v Norris* (75 AD2d 650, 652) is supportive of this position, for all that was written in that case was merely to establish the fact of defendant's understanding of his *Miranda* rights, which, when taken with his conduct in voluntarily speaking to the police, was held to constitute a valid waiver. The more recent cases of *People v Harris* (79 AD2d 615, *supra)* and *People v Baez* (79 AD2d 608) are also consistent with this approach. In fact, the only element which appears to be lacking is the express overruling of *People v Schroder (supra)*, which perhaps is implicit in the majority's determination herein.

Were it not for the suppression of the roof-top admissions, I would find no infirmity in the defendant's consent to the entry and search of his apartment subsequent to his arrest (cf. *People v Goldsmith*, 76 AD2d 843). Accordingly, were it not for our recent decision in *People v Schroder (supra)*, I would vote to uphold the decision of the suppression court. In that event I would, however, modify the conviction of criminal possession of marihuana in the fifth degree (Penal Law, § 221.10 [as it read prior to the 1979 amendment]) to unlawful possession of marihuana (Penal Law, § 221.05) in light of the absence of any trial evidence regarding the "pure" weight of the marihuana discovered in the defendant's apartment (see *People v Houston*, 72 AD2d 369).

MOLLEN, P. J., O'CONNOR and WEINSTEIN, JJ., concur with GIBBONS, J.; GULOTTA, J., concurs in the result, with an opinion.

Judgment of the Supreme Court, Queens County, rendered October 5, 1978, reversed, on the law and the facts, motion to suppress granted and indictment dismissed.

This case is remitted to the Supreme Court, Queens County, for the purpose of entering an order in its discretion, pursuant to CPL 160.50.