OPINION OF THE COURT
Alfred H. Kleiman, J.
The defendant was charged in an indictment which was handed down on April 28, 1980 with the crime of manslaughter in the first degree. It is charged that on March 23, 1980 the defendant, with intent to cause serious physical injury to Renee Walker, caused her death by stabbing her with a knife.
Defendant has made a motion for an order suppressing the statements made by him on April 1, 1980 upon the grounds that the statements were obtained during the course of custodial questioning on less than probable cause for arrest and were involuntary within the meaning of CPL 60.45.
*591 (Findings of facts and conclusions of law have been abbreviated for official publication.)
Sometime between March 23 and March 26,1980 Renee Walker was stabbed to death in her apartment. The body of the deceased was discovered on March 26, 1980 by Ellison Rhodes, the superintendent of the building.
Detective Charles Mattson arrived at the scene shortly thereafter. During an initial investigation, he was informed that the defendant was a friend of the deceased, and that a Victor Walker was also acquainted with the deceased. The defendant told the detective that the deceased had been like a mother to him and that he last saw her around midnight of March 23, when he went to her apartment to ask her for money she owed him. He said that Ms. Walker went into the living room, spoke to a man whose voice he recognized as that of Victor Walker and returned with $10 which she gave him. He then went downstairs, helped the superintendent with the garbage and went home to bed.
During the next few days the detective questioned the defendant on a number of occasions as to his whereabouts on March 23. He repeated, each time he was questioned, the subsequent events as he had described them in the first interview.
On Sunday, March 30, Detective Mattson told the defendant that to get at the truth he, Victor Walker and Ellison Rhodes should take a lie detector test. Mr. Johnson said that he was willing to take the test since he had nothing to hide.
On April 1, between 12:00 and 1:00 p.m., Mattson accompanied Johnson and Rhodes to the police academy for the polygraph tests. Detective Justin Peters, who was to administer the test, told Johnson that the polygraph was a machine that did not lie and that he did not have to take the test.
The initial test was then given. In spite of the fact that Peters knew that the results of this first test were inconclusive, he informed Mattson that he was positive that the defendant was lying. Mattson expressed surprise. Peters readministered the test. He told defendant that he had *592 again failed the test, that he was lying and that it would be to his advantage to tell the truth. The defendant said that he did not kill Renee Walker. {Mr. Nat Laurendi, defendant’s polygraph expert, testified that this test, as did the third test, indicated defendant had answered all questions truthfully.)
Peters again informed Mattson that the defendant was lying and then continued to interrogate him for another 45 minutes. When Peters failed to get defendant to change his story, Mattson then entered the interrogation room and read him his Miranda rights. Mattson then told Johnson that he was lying, that he had failed the tests, “that you’ve got problems”, and “we’ve got the icing on the cake”. The interrogation by Mattson, and at times by Peters, continued, on and off, for another six to seven hours, during which defendant at all times maintained his innocence. He was told that “if they showed the results of the test to a grand jury he could get 25 years to life.” He was repeatedly told that if he confessed he would get three years. At one point he was given another polygraph test (peak-of-tension test) and again informed that he had failed the test.
The defendant told Mattson that his girlfriend was pregnant. He was told that there is a difference between murder and manslaughter and if he didn’t confess “you won’t see your child for a long time” and that “he would spend the rest of his life in jail.” This line of “questioning” continued for hours during which he was given coffee, but was told several times during the interrogations that he would get no food until he confessed, and that he could not go home. His request for cigarettes was similarly denied. He was repeatedly told “we got to have a confession.”
Finally, at about 7:45 p.m., during the final two hours of continued interrogation by Detective Mattson, he said “I’ll tell you the truth”, and after Miranda warnings were again read to him, he made the oral and written statements which are the further subjects of this motion. He was then placed under arrest. This was approximately 9:00 p.m. He was then transported to the 13th Precinct and about one-half hour later was given a sandwich and cigarettes. The Assistant District Attorney (ADA) arrived at the precinct at around 1:00 a.m. and at 1:19 a.m. he was *593 questioned by ADA Fogel for approximately another 40 minutes which was videotaped. During this questioning he repeated his “confession”. Questioning was terminated at 1:45 a.m.
I
I find that there was no probable cause to justify the lengthy detention and custodial interrogation of this defendant.
When a police officer acts without an arrest warrant, the Supreme Court has held that there must be “probable cause” for the arrest in order to meet the standards of the Fourth Amendment. (Brinegar v United States, 338 US 160.) The probable cause standard has been held to apply when a suspect has not been formally arrested but is in police custody for investigation purposes. (Dunaway v New York, 442 US 200.) In New York, the test for whether the defendant is “in custody” is whether a reasonable man who is innocent of any crime would believe himself to be in custody. (People v Yukl, 25 NY2d 585, 589.)
At least six hours elapsed between the time defendant was first told he was lying on April 1 and the time the first “admission” was made. The District Attorney conceded that at the time that the defendant was first told he was lying, “a reasonable person would believe that he was not free to go” and that the defendant was therefore in custody at least from the time the first polygraph test was concluded. Prior to Dunaway, the New York Court of Appeals held that “a suspect may be detained upon reasonable suspicion for a reasonable and brief period of time for questioning under carefully controlled conditions” without a showing of probable cause (People v Morales, 22 NY2d 55, 64). Upon remand for an evidentiary hearing (Morales v New York, 396 US 102), this principle was reaffirmed by the Court of Appeals (42 NY2d 129). The Appellate Division upheld Dunaway’s conviction based on Morales. (People v Dunaway, 61 AD2d 299.) The United States Supreme Court, in deciding the issue it had reserved in Morales v New York {supra, at p 106), namely, “the question of the legality of custodial questioning on less than probable cause for a full-fledged arrest” reversed, stating, “seizures *594 are ‘reasonable’ only if supported by probable cause” (Dunaway v New York, supra, at p 214).
It is important to note that even in Morales, the detention was a brief 15 minutes; not the lengthy many hours of interrogation involved here.
The prosecution has the burden of coming forward with evidence that the arrest met the probable cause standard (People v Malinsky, 15 NY2d 86). The same rule of Dun-away applies equally to custodial interrogation.
The People contend that the police had probable cause to arrest the defendant after the first lie detector test. They argue that even disregarding the results of the first lie detector, the police knew defendant lied to them about the night of March 23. They contend that considering all the information then within police knowledge surrounding the circumstances of the discovery of the body together with “those lies” constituted probable cause to arrest the defendant. I hold that even if the People had satisfactorily shown that they had a reasonable basis to believe that the defendant was lying, which they did not, this would not amount to more than a basis for reasonable suspicion.
This is not a case in which defendant’s statements were “patently untrue” (see People v Ray, 62 AD2d 772, 776), or where “the police knew, of their own knowledge and observation” that defendant was lying (see People v Wheeler, 61 AD2d 737). As stated in People v Bouton (50 NY2d 130, 135), “[s]ummary statements that the police had arrived at a conclusion that sufficient cause existed will not do.”
Certainly polygraphy, even if the results were positive, has no evidentiary standing in the administration of criminal law (People v Leone, 25 NY2d 511, 514; People v Tarsia, 50 NY2d 1, 7; cf. People v Vernon, 89 Misc 2d 472), and therefore could not be considered as a basis for raising the level of reasonable suspicion to that of probable cause. However, this case clearly demonstrates why the polygraph does not warrant judicial acceptance. Whereas the People’s expert testified that the defendant had failed the last two tests, which showed he was lying, the defendant’s expert, whom I found to be a more credible witness, was certain that the very same tests (as well as his own testing) *595 satisfied him that he had answered all questions truthfully. Incidentially, Mr. Nat Laurendi only a couple of years ago was regarded by the District Attorney of New York County “as one of the nation’s foremost polygraphers” when he served as their senior polygraphic expert (see People v Vernon, supra, at p 476). Is his expertise to be given less weight because he testified on behalf of a defendant?
Defendant’s “seizure” (which is synonymous with “arrest” in these circumstances) was nothing more than an expedition undertaken in the hope that something might turn up (Brown v Illinois, 422 US 590, 605). As pointed out in Dunaway v New York (442 US 200, 208, supra, citing Brinegar v United States, 338 US 160, 176, supra), “The ‘long-prevailing standards’ of probable cause embodied ‘the best compromise that has been found for accommodating [the] often opposing interests’ in ‘safeguarding] citizens from rash and unreasonable interferences with privacy’ and in ‘seeking] to give fair leeway for enforcing the law in the community’s protection.’ ”
For the above reasons, I find that the defendant’s lengthy custodial interrogation was without probable cause for arrest in violation of his Fourth Amendment rights.
Clearly because of the close causal connection between the illegal seizure of the defendant and the subsequent “confessions”, including the videotape, these statements must be suppressed (see People v Chappie, 38 NY2d 112; see, also, People v Gonzalez, 71 AD2d 775, 776).
II
I find that the defendant’s confession was obtained, through coercion and duress and was, therefore, involuntary as a matter of law.
A confession in New York is involuntary when, according to CPL 60.45, it is obtained,
“by means of any * * * improper conduct or undue pressure which impaired the defendant’s physical or mental condition to the extent of undermining his ability to make a choice whether or not to make a statement; or * * *
*596 “by means of any promise or statement of fact [by a public servant engaged in law enforcement], which promise or statement creates a substantial risk that the defendant might falsely incriminate himself” (CPL 60.45, subd 2, pars [a], [b], cl [i]).
The courts must look to the “Totality of the circumstances’ ” (Clewis v Texas, 386 US 707, 708) to determine whether the defendant’s will has been overborne. (Culombe v Connecticut, 367 US 568, 602; Rogers v Richmond, 365 US 534.) As Justice Frankfurter described this analysis in Culombe (p 602): “The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession.”
Our courts have long recognized that coercion may be psychological as well as physical; “that the blood of the accused is not the only hallmark of an unconstitutional inquisition.” (Blackburn v Alabama, 361 US 199, 206; see, also, Townsend v Sain, 372 US 293, 307; People v Leyra, 302 NY 353, 364, affd sub nom. Leyra vDenno, 347 US 556; People v Weiss, 102 Misc 2d 830; People v Silverman, 100 Misc 2d 697, 700.) Indeed, modern-day practice is to apply psychological interrogation techniques rather than to resort to physical intimidation. (Miranda v Arizona, 384 US 436, 448.)
The People maintain that defendant’s oral, written and videotaped statements should not be held to be involuntary because they followed his voluntary submission to the polygraph tests, citing People v Tarsia (50 NY2d 1, 5, supra).
Certainly the use of the polygraph does not, standing alone, prove coercion. There is, however, as the Court of Appeals acknowledged, a “potential for abuse” (50 NY2d, at p 11). The misuse of polygraph findings is “a factor to be considered in determining whether there was impermissible coercion” (People v Leonard, 59 AD2d 1, 15).
There are several factors that distinguish the case at bar from Tarsia.
In Tarsia, the defendant had been advised of and waived his Miranda rights during earlier questioning and again at *597 the police department immediately before testing. Johnson was concededly never given his Miranda warnings until after Peters had interrogated him following the first two tests. While Johnson did sign a consent form, it did not include, amongst other warnings included in Miranda, the waiver of the right to counsel. It has recently been suggested that there should be a waiver of Miranda rights before suggesting to a defendant that he submit to such police detection techniques (People v Campbell, 81 AD2d 300, 306-307; see, also, People v Wilson, 78 Misc 2d 468, affd 47 AD2d 671). It has further been more recently suggested that once the examiner informs a defendant he has “failed” the test, any further testing or questioning has “moved from administration of a polygraph examination to police interrogation” and requires renewed Miranda warnings even assuming they have been given earlier, as they were not in this case (Henry v Dees, 658 F2d 406, 409; see, also, People v Pettiford, 78 AD2d 823).
In Tarsia (supra), the defendant was told that the test used (voice stress test) could not determine if he was lying. Johnson was told “the machine doesn’t lie.” In People v Leonard (supra), the court held a confession inadmissible where the defendant was told that the machine was infallible. The same misstatement about the polygraph was evident in this case.
In Tarsia, there was no misrepresentation that the test could be admissible in a trial. Detective Mattson told Johnson that the results could be used against him at trial as well as in the Grand Jury.
In Tarsia, the court found that the defendant was not browbeaten with accusations of untruthfulness, as I found Johnson was in this case.
In Tarsia, there was no claim that he was mistreated. The record here is replete with findings of mistreatment.
In Tarsia (supra), there were no promises or threats made that could have induced a false confession. Generally, deception by the police is not enough to render a defendant’s confession involuntary, unless it is accompanied by threats or promises. (United States ex rel. Everett v Murphy, 329 F2d 68, 70; People v Pereira, 26 NY2d 265, *598 269; People v Boone, 22 NY2d 477, 483.) In this case the deception was coupled with threats and inducements. The defendant was told that he could get 25 years to life, but if he confessed, the detective would get him a three-year sentence.
In a First Department case with similar facts, the court held that a statement by the District Attorney that he would give the defendant a break was enough to render defendant’s confession involuntary. (People v De Jesus, 63 AD2d 148.) People v Perry (77 AD2d 269) is readily distinguishable. In Perry, the court held (pp 272-273) that the fact that the detective said that he would speak to the District Attorney about a lower charge was not coercive because it was clear that the ultimate decision rested with the District Attorney’s office. Here, no such representation was made; the detective told the defendant that he could arrange a lower sentence if the defendant co-operated. (Cf. People v Diaz, 77 AD2d 523.) In addition, in Perry (supra, p 272), the court noted that the defendant was well acquainted with the criminal justice system and was “fully capable of appreciating the consequences of confessing at the time he gave the confession.” The defendant in this case has no prior criminal record. There was also no evidence that the police actually had any physical evidence (e.g., the fingerprints on the statue) with which they threatened the defendant. These further deceptions coupled with promises of leniency were impermissibly coercive.
The spirit of the statute is expressed in different terms by the court in People v Zimmer (68 Misc 2d 1067, 1074, affd 40 AD2d 955): “Psychological coercion may be any method or technique which is intended to, or may, play directly or indirectly upon the defendant, so as to instill in him a sense of fear, foreboding, insecurity or other feeling which will induce, motivate or compel him to waive his rights and respond to questions posed by law enforcement officers.” The officer’s repeated statements about the defendant’s child was obviously intended to instill a consciousness of guilt or fear about his child’s future welfare, and thus further induce him to confess.
*599 It must be reiterated that each of the factors discussed above cannot be considered separately; it is the “totality of the circumstances” that controls. Lengthy and intensive questioning coupled with a lack of food and rest may serve to lower the defendant’s resistance to interrogation. (Culombe v Connecticut, 367 US 568, 602, supra.) “A series of circumstances may each alone be insufficient to cause a confession to be deemed involuntary, but yet in combination they may have that qualitative or quantitative effect.” (People v Anderson, 42 NY2d 35, 38; see, also, People v Leyra, 302 NY 353, 363, supra.) Here, the deception by the police concerning the polygraph results, the use of promises and threats and the physical deprivations accompanying the lengthy and intensive interrogation deprived defendant of his due process rights and rendered all the statements involuntary. (See People v Chappie, 38 NY2d 112, supra.)
Where it is patent that the undeviating intent of the officers was to extract a confession, any resulting statements must be examined with the most careful scrutiny. (Spano v New York, 360 US 315, 324.) It was the People’s burden to prove that the defendant’s will had not been overborne and that his capacity for self-determination had not been critically impaired. This they failed to do. (Culombe v Connecticut, supra, at p 602; People v Anderson, supra, at p 41.)
Statements that are suppressed as violating the Fifth Amendment because Miranda warnings were not given are excludable only as evidence in chief. They may be used, nevertheless, to test the credibility of a defendant by means of impeachment, were he to testify at trial, as he did at this hearing (Harris v New York, 401 US 222). However, where, as here, a statement is excluded as being taken in violation of the Fourteenth Amendment because it resulted from duress or coercion, it is suppressed for all purposes (Mincey v Arizona, 437 US 385; People v Washington, 68 AD2d 90, affd 51 NY2d 214). This extreme sanction imposed by the Supreme Court of the United States is a reminder to all that “ours is an accusatorial and not an inquisitorial system” (Rogers v Richmond, 365 US 534, 541, supra). There is no room in our system of justice *600 for any modern forms of “the third degree”. “For the accused, of course, freedom is always at stake in a serious criminal case, but in a larger sense it is the freedom of each of us which is drawn into question.” (Standards Relating to the Prosecution Function and the Defense Function, American Bar Association Project on Standards for Criminal Justice, p 15.)
Accordingly all the statements of the defendant, oral, written, and videotaped, are suppressed for all purposes.