People v Schaefer (2025 NY Slip Op 25123)

[*1]

People v Schaefer

2025 NY Slip Op 25123

Decided on May 13, 2025

County Court, Columbia County

Herman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on May 13, 2025
County Court, Columbia County

The People of the State of New York,

against
Robert Schaefer, Defendant.

Indictment No. 70279-24

Chris Liberati-Conant, Esq.
Columbia County District Attorney
325 Columbia Street, Suite 260
Hudson, New York 12534
By: Valentina Annunziata, Esq., Assistant District Attorney 
Attorney for the People
Shane A. Zoni, Esq.
Columbia County Public Defender
610 State Street
Hudson, New York 12534
By: Bryan Bergeron, Esq., Assistant Public Defender
Attorney for the Defendant

Brian J. Herman, J.

By indictment No. 70279-24 the defendant is charged with one count of sexual abuse in the first degree in violation of Section 130.65(3) of the Penal Law, a class D felony, and one count of endangering the welfare of a child in violation of Section 260.10(1) of the Penal Law, a class A misdemeanor.
As to the charge of sexual abuse, it is alleged that on or about September 15, 2023 the Defendant subjected a child less than eleven years old to sexual contact. As to the endangering charge, it is alleged that the defendant acted in a manner likely to be injurious to the physical, mental or moral welfare of the same minor child by masturbating in close proximity to her.
In his omnibus motion, the defendant sought, among other things, suppression of certain statements he is alleged to have made to investigators pursuant to People v Huntley (15 NY2d 72 [*2][1965]) and Miranda v. Arizona (384 US 436 [1966]) and challenged the introduction of evidence of the his prior bad acts, arrests and criminal convictions pursuant to People v Sandoval (34 NY2d 371 [1974]); People v Ventimiglia (52 NY2d 350 [1981]); and People v Molineux (168 NY 264 [1901]. Hearings on the defendant's application were granted and conducted before the court on April 16, 2025.
 HUNTLEY
The question before the court is whether the defendant's inculpatory post-polygraph statements to investigators must be suppressed because Miranda warnings were not re-issued after the conclusion of the examination. The operative facts are largely undisputed and were firmly established by the unrefuted testimony of Investigators Alison Sanzi, Luke Newton and Joseph Morrissey of the New York State Police, as well as the audiovisual recordings of the events of September 16, 2023, which were received in evidence at the hearing.
The defendant called no witnesses and did not testify on his own behalf. In a post-hearing affirmation, counsel for the defendant made a series of representations as to the defendant's thoughts, feelings, observations and supposed misapprehensions during his interactions with the State Police on September 16, 2023. As resolution of whether the defendant knowingly, intelligently and voluntarily waived his Miranda rights turns in part on the issue of credibility (United States v Bayless, 921 F.Supp. 211, 213 [ND NY 1966]), insofar as the defendant did not himself testify as to these various states of mind and was not subject to cross-examination by the People, the court cannot possibly evaluate their legitimacy or reasonableness under the attendant circumstances. The vehicle by which the defendant's thought processes are here offered is not even his own sworn statement, it is that of his counsel (see United States v Dolson, 2019 WL 6843541 [WD NY 2019]). It goes without saying that the defendant had every right to stand silent at the hearing. The defendant cannot, however, shield himself from cross-examination and subsequently avail himself the opportunity to testify unchallenged through his counsel. The court will, therefore, disregard those testimonial aspects of defense counsel's affirmation (see People v. Moore, 85 Misc 3d 306, 316 [Erie County Ct 2024] [determining that an affidavit submitted after close of suppression hearing could not be considered as it was not subject to cross-examination by the People]). 
On September 16, 2023 at 5:26 p.m., Investigators Sanzi and Newton met with the defendant at his residence for purposes of investigating a report that defendant may have engaged in sexual abuse of a minor the evening prior. Upon making contact with the defendant, the investigators introduced themselves and advised the defendant as to the reason for their visit. The defendant likewise introduced himself and spoke freely and voluntarily about the incident being investigated. While narrating the events of the day leading up to the incident, the defendant mentioned that he was presently without a vehicle. Approximately ten minutes into the interview, Investigator Sanzi inquired of the defendant whether he would be willing to continue the interview at the State Police barracks, to which the defendant responded, "do I really have a choice?" Investigator Newton replied, "I'm not making you." The defendant responded, "I know, I know." When the defendant reminded the investigators that he did not have a vehicle, they offered him a ride and advised that they would provide him with transportation home. The defendant agreed without apparent reluctance, stating, "oh, absolutely, no problem." Approximately fifteen minutes elapsed between commencement of the interview and departure to the Livingston State Police barracks, where they arrived at 6:02 p.m.
Upon arrival at the barracks, the defendant was escorted to an interview room where he [*3]remained unaccompanied for approximately six minutes until Investigators Sanzi and Newton entered. Investigator Newton immediately administered the defendant Miranda warnings as set forth in People's Exhibit 2, whereupon the defendant, both verbally and by his initials on the exhibit, acknowledged understanding his rights and agreed to speak with the investigators. Questioning continued for approximately thirty minutes when the investigators left the interview room, taking with them their materials and the defendant's cell phone. Six minutes later the investigators returned to the interview room and the interview recommenced. It does not appear the defendant's cell phone was returned to him at this time. The investigators proceeded to advise the defendant that certain aspects of his recitation of the events of the evening prior were inconsistent with facts ascertained in their investigation from other sources. At this time the overall tone and tenor of the interview shifted from conversational to confrontational in nature. Approximately three minutes later, the defendant — unprompted by the investigators — indicated his willingness to submit to a lie detector test. When Investigator Newton advised that this could be arranged, the defendant replied, "I have no problem taking a lie detector test, I did not assault my daughter, and I know that's what you guys are trying to get at." As questioning continued, the defendant grew agitated and stated, "I'm done answering questions, do the lie detector test." Despite the defendant clearly and unequivocally expressing his unwillingness to continue answering questions at that time, the investigators endeavored to press on with the interview. The defendant responded to questions from Investigator Sanzi regarding a towel. A subsequent inquiry by Investigator Newton was met with the defendant's second refusal, "I'm not answering any more questions, if you want to do the lie detector test, do the lie detector test." The investigators, still in possession of the defendant's cell phone, terminated the interview and left the room to arrange for a polygraph test of the defendant that evening at Troop Headquarters in Poughkeepsie. The time that elapsed from commencement to termination of the interview was approximately one hour.
Investigator Newton testified that he and another investigator transported the defendant to Poughkeepsie in a police vehicle, arriving at approximately 8:00 p.m. Prior to departing Livingston for Poughkeepsie, there was no discussion between the investigators and the defendant about alternative means of transportation. At 8:38 p.m. Investigator Morrissey escorted the defendant into an interview room and explained that the process would begin with the defendant's review and execution of two forms, a polygraph examination agreement and release form and a second Miranda warning. As to the latter, Investigator Morrissey stated, "I believe you've already been advised of your Miranda rights today . . ." at which time the defendant interjected, "yes, I have, yup." Investigator Morrissey continued to advise the defendant that State Police policy requires he be advised of these rights once again and that he execute another waiver before proceeding with the examination. When asked if he was willing to execute these forms, the defendant unequivocally answered in the affirmative. These executed documents were received in evidence as People's Exhibit 4 and Exhibit 5. The defendant specifically inquired as to whether he would receive the results of the examination that evening and if he would be provided with a written copy. Detective Morrissey advised the defendant that the results would be disclosed to him after the examination, but that he would not be provided a copy. The defendant was not advised as to the admissibility of the examination results at any point, either orally or in writing.
After explaining the examination process in detail, answering all of the defendant's questions, generating the examination questions and reviewing them with the defendant, [*4]Investigator Morrissey commenced the examination at 10:27 p.m. The examination concluded at 10:59 p.m. Upon conclusion of the examination, Investigator Morrissey advised the defendant that he was stepping out of the interview room to speak with the investigators that he arrived with and when they return, the results would be discussed with him. The defendant agreed. The defendant was allowed to leave the interview room during this period. Eight minutes later, the defendant returned to the room with Investigator Newton and Investigator Morrissey. The defendant was not re-issued a Miranda warning prior to this discussion, which included disclosure of the examination results. The investigators inquired as to exam responses which they deemed "deceptive." When confronted with his purported deceptive responses and other inconsistencies in his narrative of the events of September 15, 2023, the defendant admitted having masturbated near his daughter while she slept next to him on the couch. At no point in this post-examination interview did the defendant invoke his Miranda rights. The interview concluded at 12:02 a.m., at which time Investigator Newton advised the defendant he would give him a ride home.
In Miranda v. Arizona, the Supreme Court held that the prosecution may not use statements stemming from custodial interrogation of a suspect unless prior to any questioning the person is warned that he has the right to remain silent, that any statement he does make may be used as evidence against him and that he has the right to the presence of an attorney, either retained or appointed (Miranda v. Arizona, 384 US 436, 444 [1966]). "The Miranda rule protects the privilege against self-incrimination and, because the privilege applies only when an accused is compelled to testify, the safeguards required by Miranda are not triggered unless a suspect is subject to custodial interrogation" (People v Pullman, 5 NY3d 122, 129 [2005]). "The standard for assessing a suspect's custodial status is whether a reasonable person innocent of any wrongdoing would have believed that he or she was not free to leave" (id. at 129). Under the circumstances detailed hereinabove, the court is without reservation concluding that immediately upon being confronted with the results of the polygraph examination, the defendant was subject to custodial interrogation.
The defendant argues that his pre-examination Miranda waiver is inapplicable to his post-examination interview, and as such, all his post-examination statements must be suppressed. In direct support of this contention, the defense cites a single case — the 1981 decision of Supreme Court, New York County (Kleiman, J.), in People v Johnson (112 Misc 2d 590 [Sup Ct, NY County 1981]). As the incriminating statement at issue in Johnson was made in a Miranda-warned six to seven hour long post-polygraph interview during which investigators made misstatements as to the "infallibility" of the device, misrepresented the admissibility of the examination results, "browbeat" the defendant with baseless accusations of untruthfulness on a record "replete" with threats, inducements and mistreatment (id. at 597), the utility of Johnson to the defendant appears not factual congruency with the present matter, but the court's observations as to then-recent trends in lie detector jurisprudence. Specifically, after noting that the consent form executed by the defendant in Johnson did not contain a waiver of the right to counsel, the court observed that it had recently been "suggested" that there should be a waiver of Miranda rights before suggesting to a defendant that he or she submit to a lie detector test (id. at 597, citing People v Campbell, 81 AD2d 300, 306-307 [2d Dept 1981]; People v Wilson 78 Misc 2d 468 [County Ct, Nassau County 1974]). More pertinent to this case, the court continued, "[i]t has further been more recently suggested that once the examiner informs a defendant that he has 'failed' the test, any further testing or questioning has 'moved from administration of a polygraph [*5]examination to police interrogation' and requires renewed Miranda warnings even assuming they have been given earlier " (Id. quoting Henry v Dees, 658 F2d 406, 409 [5th Cir 1981]; see also People v Pettiford, 78 AD2d 823 [1st Dept 1980]). 
Five months after Johnson, the United States Court of Appeals for the Eighth Circuit handed down its decision in the matter of Fields v Wyrick, 682 F2d 154, 160 [8th Cir 1982], wherein it was held that a knowing, intelligent and voluntary pre-polygraph Miranda waiver is insufficient to meet the government's burden that a defendant waived his Miranda rights for purposes of a post-test interrogation. A brief factual summary of Fields is warranted. The defendant in Fields consented to a post-arrest polygraph examination regarding a pending rape charge (id. at 156). Prior to the examination, the defendant was advised of and waived his Miranda rights (id.). After the examination was completed, the examiner advised the defendant there "had been some deceit" and pressed him for an explanation (id.). Thereupon the defendant made certain inculpatory statements and the examiner asked the defendant if he wished to discuss the matter further with an investigator (id.). The defendant agreed (id.). He was, once again, issued a Miranda warning and repeated his statement (id.). The trial court denied suppression, which the Missouri Court of Appeals held proper as the defendant "had been repeatedly and amply advised of his rights (and) voluntarily, knowingly and intelligently waived his rights" (id. at 156-157). The United States District Court for the Eastern District of Missouri denied habeas corpus relief (id. at 156). Reversing the District Court, the Eighth Circuit held that the defendant's post-examination statement to the examiner was not freely and voluntarily made and was uncured by the Miranda warning subsequently administered by the investigator (id. at 157-158). The court relied in part on the Fifth Circuit's decision in Henry v Dees, noting that neither Fields nor the defendant in Henry anticipated that the examiner would attempt to elicit incriminating statements after the examination was conducted (id. at 160). The court held that inquiry beyond the scope of the agreed-upon test parameters constituted interrogation by an investigative officer outside the presence of counsel requiring meaningfully timed Miranda warnings (id.).
Reconciling this determination with the United States Supreme Court's then-recent decision in Edwards v Arizona (451 US 477 [1981]), the court reasoned, "In Edwards v Arizona, the Supreme Court held that once a suspect invokes his right to counsel, he is not subject to further interrogation unless counsel is provided to him, unless the suspect himself initiates dialogue with the authorities." In so ruling, "the Court apparently sought to buttress the right to counsel by creating a per se rule restricting the circumstances under which a court can find that the right has been waived. Objective criteria that control the waiver determination when a suspect has invoked the right to counsel is whether counsel must be present at subsequent custodial interrogations or else the dialogue at issue must have been initiated by the accused" (id. at 158).
On petition for writ of certiorari, the United States Supreme Court summarily reversed the Eighth Circuit (Wyrick v Fields, 459 US 394 [1982]). The Court flatly rejected the Court of Appeals' suggestion that had the examiner merely "paused to remind the defendant" of his Miranda rights, there would have been no violation (id. at 396). In arriving at this conclusion, the Court reasoned, the Eighth Circuit did not examine the "totality of the circumstances" as Edwards requires (id.). The Court emphasized that the defendant did not merely initiate a meeting. By requesting a polygraph examination, he initiated interrogation. "That is, Fields waived not only his right to be free of contact with authorities in the absence of an attorney, but [*6]also his right to be free of interrogation about the crime of which he was suspected. Fields validly waived his right to have counsel present at 'post-test' questioning, unless the circumstances changed so seriously that his answers were no longer voluntary, or unless he no longer was making a knowing and intelligent relinquishment or abandonment of his rights (id.). The Court continued, "[t]he Court of Appeals relied on two facts indicating the need for a new set of warnings: that the polygraph examination had been discontinued, and that Fields was asked if he could explain the test's unfavorable results. To require new warnings because of these two facts is unreasonable" (id.). "The Eight Circuit's rule certainly finds no support in Edwards, which emphasizes the totality of the circumstances is controlling, including the fact that the suspect initiated the questioning. Nor is the rule logical; the questions put to Fields after the examination would not have caused him to forget the rights of which he had been advised and which he had understood moments before. The rule is simply an unjustifiable restriction on reasonable police questioning" (id. at 397).
After thorough review and careful consideration, this court can now draw two significant conclusions: first, that as a matter of federal constitutional law, in determining the voluntariness of the defendant's post-examination statements, the court must consider the totality of the circumstances; and second, that the totality of the circumstances of September 16, 2023 mirror those of Fields in every material respect. 
As in Fields, the defendant himself requested the polygraph examination. Both defendants were advised of and validly waived their Miranda rights prior to commencement of the examination. Both expressly requested they be provided the results of the examination. Immediately after the examination, it was communicated by the examiner to both defendants that the device had detected deception in their responses. Both were asked to explain why the device revealed indicia of untruthfulness. In response, both defendants made inculpatory statements. Neither defendant at any time invoked their Miranda rights. Neither was subject to questioning for an unreasonable length of time. Neither was threatened, coerced, induced, lied to or otherwise mistreated. Accordingly, as a matter of federal constitutional law, suppression must be denied.
This does not, however, conclude the analysis. "State courts are bound by the decisions of the Supreme Court when reviewing federal statutes or applying the federal Constitution. However, under established principles of federal supremacy the states also have sovereign powers. When their courts interpret state statutes or the state constitution the decisions of these courts are conclusive if not violative of federal law. Although state courts may not circumscribe rights guaranteed by the Federal Constitution, they may interpret their own law to supplement or expand them" (People v P.J. Video, Inc., 68 NY2d 296, 301-302 [1986]). Therefore, we must ascertain whether the law of this state affords the defendant greater protection than is required under the Federal Constitution.
The court has identified no decision of any New York court rejecting the Supreme Court's decision in Wyrick as affording the accused insufficient protection under the laws or Constitution of this state. In fact, the only two reported decisions of New York courts citing Wyrick do so in affirmance of the denial of suppression (see People v Hasty, 25 AD3d 740 [2d Dept 2006]; see also People v Martino, 259 AD2d 561 [2d Dept 1999]). Martino appears particularly analogous, wherein the Second Department held that it was not necessary to reissue Miranda warnings to the defendant after he made an inculpatory statement upon exiting a room where he had been given a polygraph test (Martino, 259 AD2d at 562). The court also finds the [*7]Second Department's decision in People v Ghee (153 AD2d 954 [2d Dept 1989] particularly instructive. In Ghee, the court held that the defendant knowingly, intelligently and voluntarily waived his right to counsel prior to a polygraph examination and that this waiver applied to the post-polygraph interview during which he made an inculpatory statement (Ghee, 153 AD2d at 955). Accordingly, as a matter of state law, suppression must be denied, except as to those statements elicited by Investigators Sanzi and Newton at the Livingston State Police barracks after the defendant's unequivocal invocation of his right to remain silent (see People v Johnson, 106 AD3d 1272 [3d Dept 2013].

SANDOVAL
The People seek to cross-examine the defendant, should he elect to testify, with respect to the defendant's 1991 misdemeanor conviction of attempted endangering the welfare of a child (Penal Law §§110.00; 260.10). The People limit their application in this regard to inquiry to the level of the offense and year of conviction. There appearing to the court no discernable probative value of a misdemeanor conviction 33 years attenuated in time, the application is denied.
Accordingly, it is hereby
ORDERED that the defendant's motion for suppression of statements elicited by Investigators Sanzi and Newton after the defendant's unequivocal invocation of his right to remain silent at the Livingston State Police barracks is granted; and it is further
ORDERED that the defendant's motion for suppression of statements made by the defendant during his post-examination interview is denied; and it is further
ORDERED that the People's application to cross-examine the defendant, should he elect to testify, with respect to his 1991 misdemeanor conviction of attempted endangering the welfare of a child is denied; and it is further
ORDERED that jury trial on indictment No. 70279-24 shall commence on May 27, 2025 at 9:00 a.m.
This constitutes the decision and order of the court.
Dated: May 13, 2025
Hudson, New York
Hon. Brian J. Herman
County Court Judge
Papers considered:
Indictment No. 70279-24
Defendant's Proposed Findings of Fact and Conclusions of Law, dated April 30, 2025
People's Affirmation in Summary of Pre-Trial Hearings, dated April 30, 2025
Exhibits Received:
People's Exhibit 1: audio of interview, defendant's residence and transport to SP Livingston
People's Exhibit 2: Miranda warning card — SP Livingston
People's Exhibit 3: video of interview — SP Livingston
People's Exhibit 4: Miranda warning — SP Poughkeepsie
People's Exhibit 5: Polygraph Examination Agreement and Release Form — SP Poughkeepsie
People's Exhibit 6(a): video of polygraph instructions and examination — SP Poughkeepsie
People's Exhibit 6(b): video of continuation of polygraph examination and post-polygraph interview — SP Poughkeepsie
Defendant's Exhibit A: New York State Police Polygraph Unit Examination Score Sheet