OPINION OF THE COURT
Joseph Jaspan, J.
Defendant has been indicted for the crime of grand larceny in the second degree.
The allegation is that defendant, while a deliveryman for White Rose Food Corporation, paid money to an employee of its customer, King Kullen Food Corp. to acknowledge receipt of dairy products withheld from a scheduled delivery and diverted for the benefit of the defendant.
In early November, 1978, the security force of White Rose came into possession of a confession by one Harold Davis, a *698 King Kullen employee, admitting his participation in the scheme and inculpating the defendant.
Thereafter and under circumstances detailed below, the defendant also executed a confession which he now moves to suppress upon the ground that it was involuntarily given while he was under psychological coercion.
Facts
At 8:30 a.m. on November 13, 1978, Benedict Panzarella, White Rose’s security director; Harold Bruu, a security investigator for White Rose; and Richard Bray, the dairy department supervisor, intercepted the defendant at the King Kullen Middle Island store in Suffolk County and informed him that they were investigating dairy thefts and would like to talk with him.
Silverman was asked to accompany Panzarella and Bruu back to White Rose’s offices in New Jersey while Bray would complete the deliveries on his route for that day. Silverman entered Panzarella’s car without apparent objection but it must have been obvious to him that had he refused to do so he would have jeopardized his job and been left with no readily available means of getting back to his own car which was also parked in New Jersey.
The defendant was told that a King Kullen employee had implicated him in the alleged thefts and he was shown a copy of Davis’ confession. The defendant denied any participation or involvement.
At approximately 11:00 a.m. Panzarella stopped and called a firm known as IBI to arrange for a polygraph exam of the defendant. Upon the completion of this call, the defendant was informed that he was to submit to a polygraph test "or we have no other course of action but to take out a formal complaint.”
Upon arriving at IBI at about 11:30 a.m., the defendant was left with one Thomas Horan who was to question him further as to his involvement in the alleged thefts and administer the lie detector test.
Silverman was taken to a room and seated in what is described as a polygraph chair. Horan began a pretest interview, introduced him to the machine and told him that he would be asked if he would take the exam or would object. *699 The defendant was not given the Miranda warnings and was not told that the polygraph results were inadmissible in a court of law. Some eight minutes into the interview, the defendant told Horan that he would be willing to discuss the shortages with Panzarella.
Upon Panzarella’s return the defendant made his confession after first being promised that White Rose would not prosecute him. There was no promise as to what action King Kullen would take but he was told that it would be best for him if he co-operated with everybody.
Silverman, Panzarella, and Bruu then returned to New Jersey where the defendant was questioned again. Upon a promise that the personnel department would be asked not to give him a bad recommendation, the defendant implicated other drivers who were involved in the alleged thefts. At 5:00 p.m. Silverman was then allowed to leave.
The court also takes note that both Panzarella and Bruu had been experienced police officers, that the defendant was never left alone from 8:30 a.m. until 5:00 p.m., was not provided with food during this time and that the defendant appeared at times to be in a nervous mental state.
There was no police participation on that day.
The Law
Miranda warnings were not given to the defendant at any time during the events of November 13. However, as the defendant concedes, a confession given to private individuals is not rendered invalid by the mere failure of such persons to give the warnings (People v Horman, 22 NY2d 378, cert den 393 US 1057).
The admissibility of the confession is governed by CPL 60.45 (subds 1, 2, par [a]) which states in relevant part: "1. Evidence of a written or oral confession, admission, or other statement made by a defendant with respect to his participation or lack of participation in the offense charged, may not be received in evidence against him in a criminal proceeding if such statement was involuntarily made. 2. A confession, admission or other statement is 'involuntarily made’ by a defendant when it is obtained from him: (a) By any person by the use or threatened use of physical force upon the defendant or another person, or by means of any other improper conduct or undue pressure which impaired the defendant’s physical or *700 mental condition to the extent of undermining his ability to make a choice whether or not to make a statement”.
This section does not limit itself to confessions made to law • enforcement personnel but states that they are inadmissible if involuntarily made to "any person”. Thus, if Silverman’s confession was not the act of his free will it must be suppressed.
The courts have consistently held that psychological coercion can render a confession involuntary. "Torture of the mind is just as contrary to inherent fairness and basic justice as torture of the body.” (People v Leyra, 302 NY 353, 364; Leyra v Denno, 347 US 556.)
As further , stated in Townsend v Sain (372 US 293, 307): "If an individual’s 'will was overborne’ or if his confession was not 'the product of a rational intellect and a free will’, his confession is inadmissible because coerced. These standards are applicable whether a confession is the product of physical intimidation or psychological pressure”.
Moreover, a determination of whether a confession has been psychologically coerced must be based upon the totality of the circumstances (People v Anderson, 42 NY2d 35; People v Leonard, 59 AD2d 1) with the burden on the People to prove its voluntariness beyond a reasonable doubt (People v Valerius, 31 NY2d 51; People v Adams, 64 AD2d 712).
The defendant had protested his innocence during the ride to Jamaica in spite of the Davis confession and the "soft sell” pressure of his escorts. His position changed within minutes after he was, without preparation or consent, abandoned to the unfriendly and strange arms of a polygraph chair, the professionalism of the technician and the awesome and threatening probing of a machine commonly referred to as a "lie detector”. He was without practical means of escape.
He could refuse the test but that option was not articulated. He could flee the scene and invite the loss of his job and the threatened prosecution. Or he could confess — hoping that "his friends” from the company would be satisfied by information as to others.
While the use of a polygraph does not in and of itself render a confession inadmissible as the product of coercion (People v Leonard, 59 AD2d 1, supra; People v Wilson, 78 Misc 2d 468, affd 47 AD2d 671), it can be an important factor in achieving that result.
*701 In People v Zimmer (68 Misc 2d 1067, 1074, affd 40 AD2d 955), the court found that a defendant’s confession had been involuntarily obtained by the use of a polygraph exam and defined psychological coercion as: "any method or technique which is intended to, or may, play directly or indirectly upon the defendant, so as to instill in him a sense of fear, foreboding, insecurity, or other feeling which will induce, motivate or compel him to waive his rights and respond to questions posed by law enforcement officers. Psychological coercion, while difficult to assess, is a direct threat brought to bear by a sophisticated type of pressure.”
In the instant case the scenario was designed to create the maximum impact upon the subject. The interrupted ride, the lack of preparation of the defendant for the IBI visit, the disappearance of the escorts when the defendant was exposed to a machine which threatened to invade the privacy of his mind, the lack of real alternatives constituted pressure to overcome the will of the defendant. A compelling conclusion is that the security men intended to instill in the defendant that fear and insecurity which would induce, motivate, or compel him to waive his rights.
The People have failed to meet its burden to prove the voluntariness of the confession. I conclude that the confession and all admissions and statements thereafter made in the subsequent interrogation of the defendant should be suppressed.