*586 OPINION OF THE COURT
Ruth Pickholz, J.
Defendant was arrested on August 22, 1991 and charged with petit larceny (Penal Law § 155.25) and criminal possession of stolen property in the fifth degree (Penal Law § 165.40). The gravamen of the charges is that defendant stole the contents of a mail package entrusted to him in his capacity as a United Parcel Service (UPS) employee.
Defendant moves to suppress statement evidence on the ground that UPS security officers obtained the statements by interrogating him without administering the required Miranda warnings. Defendant also contends that the confessions were "involuntarily made” within the meaning of CPL 60.45.
THE FACTS
On February 25, 1992, a hearing on this motion was conducted before me. The sole witness was Mr. Peter Caruso, the supervisor of the UPS Loss Prevention Department, who testified that he has been employed at UPS for the last five years. His primary responsibility is the investigation of employee theft. Neither Mr. Caruso nor any of the other UPS employees who participated in, or were present during, the questioning of defendant work for the Police Department in any capacity. Mr. William Mitchell, the Department Manager of the Loss Prevention Department, and Mr. Caruso’s immediate superior, is a former police officer but has been retired for seven years.
Mr. Caruso testified that he has handled approximately 100 cases of employee theft in the time he has worked for UPS. The company managed to obtain written confessions from the employees in "about 98 percent” of the cases. On none of these occasions did the employee keep his or her job. However, some employees were not arrested because of insufficient evidence. Mr. Caruso denied that there was any arrangement whereby employees were promised they would not be arrested in the event that they agreed to cooperate. Only Mr. Mitchell or UPS counsel was authorized to decide whether to have someone criminally charged.
On August 22, 1991, defendant was working at the UPS office located at 643 West 43rd Street in New York County. In one area of that building, known as the "Hub,” packages are sorted by zip code so they can be picked up and delivered to the appropriate locations around the country. At some point *587 in the evening, defendant’s superior, Mr. Michael Hughes, learned that some packages had been "missorted.” He asked defendant to take the missorted packages to the area where they belonged. Approximately 15 to 20 minutes later, one of these packages was found lying empty on a stairwell. It was brought to Mr. Hughes, who recognized it as one of the "missorts” he had given to defendant.
Defendant was escorted to the air sort office located on the first floor and asked to empty his pockets. He refused this request, but stated that he needed to go to the bathroom located next door. Mr. Hughes followed defendant into the bathroom and, once there, observed defendant take some items out of his pocket and throw them onto the floor. Mr. Hughes picked up the items (which turned out to be gold chains), accompanied defendant back to the office, and called Mr. Caruso. (In all, 34 gold chains were recovered from defendant. The box in question had contained 53 chains; UPS has not been able to account for the difference.)
Mr. Caruso and Mr. Hughes conducted the first round of questioning, which took place on the first floor office, from approximately 11:45 p.m. to midnight. Although defendant initially denied knowing anything about a theft, Mr. Caruso persisted, telling defendant "there was a problem and me and him had to work the problem out.” He testified that he neither threatened defendant nor promised him anything in return for his cooperation. Mr. Caruso similarly stated that he never told defendant he was not free to leave.
However, Mr. Caruso also testified that, when defendant did not respond to his inquiries, "I told him, I said, listen, you know, if you want to sit here and dance about this all night long you can, but the fact of the matter is you have a very serious problem and if you want to get the problem resolved, I think we need to talk to each other and cooperate about this right now.” Apparently, at this point or shortly afterwards, defendant orally admitted taking the merchandise. A decision was then made to reconvene to a quieter, more isolated office on the sixth floor. Before leaving, Mr. Caruso asked defendant as to the whereabouts of the package invoice. Defendant took out his wallet and handed Mr. Caruso a slip of paper, which was later identified as the invoice for the recovered merchandise.
In an effort to obtain a written confession, the UPS officials questioned defendant further in the sixth floor office. Mr. *588 Caruso conducted this interrogation in the presence of Mr. Mitchell and Mr. Richard Stubits, a loss prevention supervisor. Defendant was "very hesitant” to provide a written confession. Mr. Caruso again reviewed the facts of the situation with defendant, and explained the necessity of getting "everything in order so there is no misunderstanding about what happened.” Defendant was anxious and wanted to know what UPS was planning to do to him. Mr. Caruso told defendant that he was not the person who would make this decision.
At some point between 12:00 and 12:30 defendant wrote a statement in which he denied involvement in the theft and claimed that the box in question had been given to him already opened. Mr. Caruso read the statement and challenged defendant on its accuracy. Caruso told defendant that the statement did not "match” either defendant’s oral admission or the facts as they were known. Defendant did not respond. The written exculpatory statement was "discarded” in defendant’s presence and a new form was then handed to defendant, who finally relented and wrote out a statement admitting that he had been asked to walk the package over, that he had opened the package and removed its contents, and that he had attempted to dispose of the merchandise after being confronted with the empty box.
After defendant had written and signed the second statement (at approximately 12:30 p.m.), Mr. Mitchell told Mr. Caruso to have defendant arrested. This instruction was made outside of defendant’s hearing. Defendant had been left inside the office with Mr. Mike Scrobe, the Hub sort manager. He did not learn he was being arrested until the police arrived on the premises.
Sometime that evening, Mr. Caruso informed defendant that he could no longer work for UPS. He could not remember whether defendant learned that he was being discharged before or after making the written confession.
CONCLUSIONS OF LAW
There is no evidence that the UPS officers in this case were acting under the direction or in concert with the police. No police or peace officers were present when defendant was questioned, and there is no indication that the police were aware of defendant’s interrogation. Their only role was to arrest defendant and escort him to Central Booking. All evidence was obtained by UPS itself.
*589 Clearly, this is not a case where private conduct has been "so pervaded by governmental involvement that it loses its character as such and invokes the full panoply of constitutional protections.” (People v Ray, 65 NY2d 282, 286 [1985].) The Miranda safeguards are thus inapplicable (supra), and defendant’s motion to suppress on this ground is accordingly denied.
The absence of "State action” is not a defense to suppression under CPL 60.45 (2) (a), which codifies the common-law rule excluding involuntary confessions. This statute applies to governmental entities and private actors alike. (See, People v Grillo, 176 AD2d 346 [2d Dept 1991] [lower court erred by denying defendant’s motion for a Huntley hearing where defendant alleged the statements had been obtained by the complaining witness through physical duress].) It provides:
"A confession, admission or other statement is 'involuntarily made’ by a defendant when it is obtained from him:
"(a) By any person by the use or threatened use of physical force upon the defendant or another person, or by means of any other improper conduct or undue pressure which impaired the defendant’s physical or mental condition to the extent of undermining his ability to make a choice whether or not to make a statement”.
In this case, there is no evidence that UPS used or threatened the "use of physical force upon the defendant” or that defendant was subject to any form of physical deprivation. Accordingly, the issue for determination is whether UPS "by means of * * * pressure * * * impaired the defendant’s * * * mental condition to the extent of undermining his ability to make a choice whether or not to make a statement”. The People have the burden of proving the voluntariness of the statement beyond a reasonable doubt. (People v Valerius, 31 NY2d 51 [1972]; People v Grillo, supra.) The People must show that at the time the statement was made defendant’s " 'will [was not] overborne and his capacity for self-determination [was not] critically impaired’ ” (People v Anderson, 42 NY2d 35, 41 [1977], quoting Culombe v Connecticut, 367 US 568, 602 [1961]).
At least three published decisions in this State (People v Silverman, 100 Misc 2d 697 [Sup Ct, Suffolk County 1979]; People v Weiss, 102 Misc 2d 830 [Sup Ct, NY County 1980]; People v Sanchez, NYLJ, Apr. 8, 1988, at 14, col 2 [Crim Ct, NY County]) have discussed the issue of when private conduct *590 constitutes mental coercion sufficient to render a statement inadmissible under CPL 60.45 (2) (a). A brief review of these decisions will illuminate the factors courts have found relevant in this context.
The defendant in People v Silverman (supra) was intercepted on his way to work by private security officers who had been retained by defendant’s employer. They asked defendant to accompany them to their offices in New Jersey. On the car ride there, the officers told defendant he had been implicated in various thefts from his employer. However, defendant denied any knowledge or involvement.
Approximately two and a half hours later, the officers stopped the car without warning and called a polygraph company. They told defendant that, unless he agreed to take a polygraph test, they would have "to take out a formal complaint.” (100 Misc 2d, at 698.) Defendant was then taken to the company headquarters, where he was escorted to a room and seated in a polygraph chair. He was asked whether he would object to taking the test, but was not told that the results would be inadmissible in a criminal trial. Shortly after being seated, defendant expressed his willingness to discuss the thefts. One of the security officers was called into the room, and defendant proceeded to make a full confession.
In granting defendant’s motion to suppress, the Silverman court emphasized its belief that the polygraph test had been administered so as to convince defendant that he had no alternative but to make a statement. Significantly, defendant’s "position changed within minutes after he was, without preparation or consent, abandoned to the unfriendly and strange arms of the polygraph chair, the professionalism of the technician and the awesome and threatening probing of a machine commonly referred to as a Tie detector’. He was without practical means of escape.” (Supra, at 700.) The court concluded that the security officers had "instill[ed] in the defendant that fear and insecurity which would induce, motivate, or compel him to waive his rights.” (Supra, at 701.)
The decision in People v Weiss (supra) also addressed potentially overreaching private conduct. The defendant in that case ran a travel agency. One day enforcement agents of the Air Traffic Conference of America (ATC), a private organization that regulates the travel industry, called upon defendant, examined his accounts, and informed him that he owed ATC over $80,000. That same afternoon defendant wrote a certified *591 check to the agents. He later placed a "stop payment” order and moved to suppress evidence of the check on the ground that it had been involuntarily obtained.
Defendant testified at the Huntley hearing that the agents threatened him in loud voices, telling him ATC would put him out of business unless he paid everything he owed, and that they had prevented him from attending his grandfather’s funeral. The People’s witness testified that the agents never raised their voices or restrained defendant, and that defendant had written the check without any pressure or even a request to do so by the agents.
The court found there was reasonable doubt whether defendant wrote the check voluntarily and therefore granted the defendant’s motion to suppress. It relied upon the evidence that defendant had been held against his will; that specific threats had been made to induce defendant’s cooperation; and that defendant had not had adequate time to consult with counsel or to reflect on the options available to him before writing out the check.
People v Sanchez (supra), like the instant case, involved statements made directly by an employee to his employer. Defendant there was assigned to the cash register at a clothing store. He was observed giving a customer four pairs of jeans without receiving payment for them. The store manager confronted the customer as he left the store and confiscated the jeans. He then examined the register tape and discovered no record of a purchase of four pairs of jeans. Defendant was told to wait in the manager’s office pending the arrival of two officers from the store’s loss prevention program.
The store manager and security officers questioned defendant in the office from 1:45 p.m. to 5:00 p.m. Defendant admitted stealing property from the store on numerous occasions over the last three months, and wrote a statement to this effect after several hours of interrogation.
A week later defendant returned to the store with two bags of clothing. He met with the store manager and two other employees for 30 minutes and wrote another statement recounting his thefts from the store over an extended period of time. The police were then called and defendant placed under arrest.
The court denied defendant’s motion to suppress. It reasoned that, although defendant must have known that the store could both discharge him and arrange for him to be *592 brought up on criminal charges, these considerations did not mandate a finding that the statements were involuntary. "The court finds nothing improper about an employer, acting in good-faith during an investigation of employee misconduct, who confronts an employee with the allegations of wrongdoing and demands a response. It is beyond cavil that any employer is legally privileged to fire an employee and criminally prosecute him for theft of the employer’s property.” (Supra, at 15, col 1.)
This court agrees that an otherwise voluntary statement is not rendered inadmissible merely because the employee knows that the employer can fire him, have him arrested, or both. “[T]he rule excluding involuntary confessions does not protect against hard choices when a person’s serious misconduct has placed him in a position where these are inevitable.” (United States v Solomon, 509 F2d 863, 872 [2d Cir 1975].) Indeed, the existence of such a dilemma may show that the defendant had his own reasons for choosing to cooperate. The ultimate question is whether the defendant chose to cooperate or whether the decision was made for him.
In this case, there is cause to believe defendant was under the impression he had no choice but to confess. Defendant apparently resisted making any statement until Mr. Caruso told him that they could "dance around all night.” This expression could reasonably be understood to mean that UPS would not be satisfied until defendant made a full confession and that he would be held for as long as it took to obtain one. Thus, defendant might well have thought that his only option was to confess later rather than sooner, but confess he would have to do.
On the present record, defendant’s reluctance to make a statement is not open to dispute. Shortly after Mr. Caruso warned defendant about "dancing,” defendant orally admitted stealing the gold chains. He subsequently attempted to retract this admission by writing out an exculpatory statement. The fact that defendant quickly reconsidered and sought to repudiate the admission supports an inference that defendant did not decide to talk because of any calculation of his own, but merely because of pressure applied by others. (Cf., People v Weiss, supra.) Similarly, Mr. Caruso’s testimony that he discarded defendant’s exculpatory statement and handed defendant another piece of paper also shows that pressure was exerted on defendant to inculpate himself.
*593 Finally, Mr. Caruso’s testimony established that UPS persuaded defendant to write the inculpatory confession by reminding him that he had already admitted taking the merchandise. In light of the direct causal connection between the statements, the written confession must be deemed a product of the oral admission. (People v Bethea, 67 NY2d 364 [1986]; People v Douglas, 124 AD2d 815 [2d Dept 1986].)
In the circumstances of this case, where there is evidence that defendant was held against his will, removed to an isolated location, and pressured to make a written confession, the court finds there is a reasonable doubt whether defendant made the statements of his own free will. Accordingly, defendant’s motion to suppress the statement evidence is granted.